Elisabeth M. BYRNE, Administratrix of the Estate of Alice Mora, Deceased,

v.

Michael A. MATCZAK and Ernest Stancick, Individually and Jointly and Trading as Tylersport Garage, Appellants.

No. 12443.

United States Court of Appeals Third Circuit.

Argued March 17, 1958.

Decided April 23, 1958.

Henry Temin, Philadelphia, Pa. (Max E. Cohen, Francis E. Marshall, T. Henry Walnut, Philadelphia Pa., on the brief), for appellants.

B. Nathaniel Richter, Philadelphia, Pa. (Kenneth Syken, Richter, Lord & Levy, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This action was brought by the administratrix of the estate of Alice Mora, who was killed when the passenger car she was driving collided "head-on" with a truck driven by Philip Freed, the defendants' servant. The accident occurred in Pennsylvania. Jurisdiction is based on diversity of citizenship, and the plaintiff seeks to enforce rights under the Pennsylvania Wrongful Death and Survival Statutes. 12 P.S. § 1601; 20 P.S. § 320.603. The findings of the jury on special interrogatories were for the plaintiff, and the defendants moved for a new trial. The district court denied the motion. On this appeal the defendants urge that they were entitled to a new trial on three distinct grounds.

The first of the defendants' contentions is that the evidence did not justify a conclusion that Freed was on the wrong side of the road at the time of the accident. The highway on which the accident occurred is a two-lane country road with a concrete surface only 18 feet wide. The truck was slightly more than 8 feet wide, leaving less than one foot within which to maneuver on the proper side of the road. The truck weighed 8 tons empty, and at the time was loaded with about 15 tons of sand. It would undoubtedly have been difficult to handle the heavy vehicle properly on so narrow a road even under optimum conditions. But at the time of the accident Freed was not travelling under optimum conditions. First, he was exceeding the safe speed limit by about 10 or 15 miles per hour while travelling down an incline. Second, he was not wearing the glasses which he was required to wear while driving. There was evidence that on occasion a muscular spasm would cause his right eye, when unaided by the glasses, to cross his left.

Under these circumstances special significance attaches to the testimony of eye witness Fleming, who testified that Freed's speeding truck was weaving over the road about 1,000 feet before reaching the point of the impact. He also claimed to have observed the decedent travelling at moderate speed, and on the proper side of the road shortly before the crash. This is, to be sure, not direct evidence on the situation at the precise instant of the impact. But here the inferences permissible from evidence of conduct not more than 20 seconds prior to the collision have distinct probative value in showing how the accident took place. This is not a situation where behavior is observed at some point or time so remote from the accident that what happened later remains only conjectural. See Satovich v. Lee, 1956, 385 Pa. 133, 122 A.2d 212. Instead, the jury could reasonably have concluded that the weight of the truck, the excessive speed, and the poor vision of the driver, combined to deprive Freed of control essential for driving on so narrow a road; that this incapacity was demonstrated and proved by weaving in the face of oncoming traffic; that the truck was not under proper control half a minute prior to the accident, and that it was, therefore, more probable than not that Freed, and not the decedent, was on the wrong side of the road at the moment of the impact.

Of course, the jury could have found otherwise. It was free to accept or reject the testimony we have outlined. See Bills v. Zitterbart, 1949, 363 Pa. 207, 69 A.2d 78. The fact that the jury chose one of two permissible versions of the way the accident happened does not make the verdict invalid. We are not unmindful that a verdict should be set aside as conjectural when the trier of fact is confronted with two theories of the way in which the accident occurred, and there is no reasonable basis for choosing one theory over the other. Here there was rational basis for a conclusion that Freed rather than the decedent was on the wrong side of the road. See Mitchell

v. Stolze, 1953, 375 Pa. 296, 100 A.2d 477; Sevitch v. De Angelo, 1950, 365 Pa. 64, 73 A.2d 372; Bills v. Zitterbart, supra. Cf. Sweeney v. Bonacci, 3 Cir., 1949, 173 F.2d 541. There was no reason for judicial interference with such a finding. See Decker v. Kulesza, 1952, 369 Pa. 259, 85 A.2d 413.

■■ The defendants add another evidentiary consideration. The decedent was admittedly an unlicensed driver. Although such violation of the law may be negligence per se, cf. McCoy v. Vankirk, 1954, 377 Pa. 515, 105 A.2d 112, "the general principle is that the violation of a statute will not create a liability unless it is the efficient cause of the injury." See Stubbs v. Edwards, 1918, 260 Pa. 75, 78, 103 A. 511, 512; Miller v. Gutherie, 1937, 325 Pa. 495, 191 A. 61. And this rule has been applied to unlicensed drivers. Barker v. Reedy, 1950, 167 Pa.Super. 222, 74 A.2d 533; Lloyd v. Noakes, 1929, 96 Pa.Super. 164. The principal evidence of causation is Freed's testimony that the decedent swerved into him, which, the jury could, and, on this record, did reject.

■■ The second major contention for reversal concerns the dispersal of the jury overnight while deliberation on the verdict was in progress. The case was given to the jury at 3:56 p. m. and at 10:35 p. m. the jury announced that it had not agreed on a verdict. The court then admonished the jury to discuss the case with no one, and dismissed the jurors for the night. When the jury returned, the next morning at 10:00 a. m., the court asked each juror whether he had discussed the case with anyone, and each juror answered that he had not. Thereupon, the judge permitted the jury to retire and continue its deliberations. The verdict was brought in seven hours later at 5:11 p. m. Timely objections were made to the separation of the jurors. It is now argued that this procedure was improper and even that it was a denial of the benefit of jury trial as guaranteed by the Seventh Amendment. This contention has been urged upon appellate courts of the United States only infrequently, and it has never been accepted. In Franklin v. Shelton, 10 Cir., 1957, 250 F.2d 92, 99, where the procedure was almost identical to that in the present case, the court noted that no objection had been made to the dispersal. It continued, however, by saying:

> "Neither does the record show facts indicating an abuse of discretion by the trial Court in allowing the jury to separate and continue its deliberations the following morning."

Although little has been written on the subject by the courts which have considered dispersal, no inflexible rule has been permitted to dominate practice. Two points seem to have been thought controlling: First, that the decision whether to allow dispersal is primarily a matter requiring an exercise of discretion of the district judge, and second, that reversal is proper only when the judge has acted arbitrarily or when prejudice is shown to have resulted from the dispersal. See Franklin v. Shelton, supra; Bratcher v. United States, 4 Cir., 1945, 149 F.2d 742, certiorari denied 325 U.S. 885, 65 S.Ct. 1580, 89 L.Ed. 2000; Brown v. United States, 1938, 69 App.D. C. 96, 99 F.2d 131; Lucas v. United States, 8 Cir., 1921, 275 F. 405, certiorari denied 258 U.S. 620, 42 S.Ct. 272, 66 L. Ed. 795; Guardian Fire Ins. Co. of Pennsylvania v. Central Glass Co., 5 Cir., 1912, 194 F. 851; Liverpool & London & Globe Ins. Co. v. N. & M. Friedman Co., 6 Cir., 1904, 133 F. 713; Walton v. Wild Goose Mining & Trading Co., 9 Cir., 1903, 123 F. 209, certiorari denied 194 U.S. 631, 24 S.Ct. 856, 48 L.Ed. 1158. True, the allowance of a dispersal is contrary to the old common law. And there is, in Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, strong language to the effect that the Seventh Amendment perpetuated jury procedures as they existed in 1791. However, prior to Dimick v. Schiedt, the entire development of this area was to the effect that the constitutional conception of jury trial is not inflexible in all details, so

long as the essential elements of the institution are preserved. E. g., Gasoline Products Co. v. Champlin Refining Co., 1931, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188; Ex parte Peterson, 1920, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919, and see generally Scott, Trial by Jury and the Reform of Civil Procedure, 1918, 31 Harv.L.Rev. 669. And since Dimick v. Schiedt, supra, this older line of reasoning has been reaffirmed in Galloway v. United States, 1943, 319 U.S. 372, 388–396, 63 S.Ct. 1077, 87 L.Ed. 1458. In this view, fair new procedures, which tend to facilitate proper fact finding, are allowable, although not traditional. See Shane v. Warncr Mfg. Corp., 3 Cir., 1956, 229 F.2d 207, certiorari dismissed 351 U.S. 959, 76 S.Ct. 860, 100 L.Ed. 1481; Waldrip v. Liberty Mut. Ins. Co., D.C.W.D.La.1951, 11 F.R.D. 426, where, after proper instructions, juries were allowed to take into the deliberation room calculations made by counsel, although not introduced into evidence, as to the size of the verdict.

Moreover, in logic there is much to be said for the proposition that jurors are less likely to reach impartial decisions when kept at their task to the point of exhaustion than they are after a good night's rest; and that the likelihood of corruption from dispersal cannot be an overwhelming danger, since juries traditionally are permitted to separate each evening throughout the taking of testimony in long civil trials. And since the trial judge is in the best position to weigh the various factors relevant to the decision whether the time has come when it is better to permit the jurors to separate than to keep them longer together, he should initially be given the discretion to do so. In this case, the circumstances show no abuse of discretion. And finally, it is conceded that no prejudice has been shown. Indeed, we have the testimony of each of the jurors to the contrary and nothing casting doubt upon their assertions. There was no error in the handling of the jury.

Finally, the appellant claims that an instruction to the jury on the issue of damages was erroneous. Several possible items of damage were submitted to the jury. The disputed item is an award of $3500. for loss of consortium, which the district court described as follows:

"Now to go on to loss of consortium. Consortium is a right growing out of the marital relationship and comprises affection, companionship, love, fellowship, and the many acts, deeds and assistance which a wife renders to a husband to secure the success and happiness of a normal marriage relationship."

The court had previously charged that in computing the separate item of damages allowable for loss of services, the value of a wife's services must be measured with due consideration for the affection which impels a normal spouse to perform better than a mere hireling. This was in accord with our decision in Brest v. Philadelphia Transp. Co., 3 Cir., 1954, 216 F.2d 331. The additional instruction of which complaint is made seems to have called upon the jury to place a value, not only upon services viewed in the light of the affection with which they would have been performed, but also and separately upon the enjoyment of affection and companionship.

The appellee objects to a consideration of this question at all, because the alleged error was not pointed out to the district court other than by a general exception to the entire charge. It is clear that a general exception ordinarily will preserve no rights:

" * * * In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a

new trial." See Palmer v. Hoffman, 1943, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645.

■ In this case, however, the jury answered special interrogatories concerning the value of each item of damages. Thus, it is known that the loss of consortium was considered as a separate item and valued at $3500. Had this been properly objected to, and had the district court concluded that there was no right to recover for loss of consortium, the only result would have been the removal of this item from the jury's consideration, and the consequent lowering of the verdict by $3500. In these circumstances, the policy of Rule 51, Fed. Rules Civ.Proc. 28 U.S.C.A., designed to prevent retrials on errors which might have been corrected at the initial stage, does not prevent appellate consideration of this single item. A reversal on this point will in no way change the posture of the case, except to remit to the defendants an amount which they should not be required to pay.

■ The general rule of damages is that in death actions there is no recovery for loss of consortium or society. See Prosser, Torts (2d ed. 1955) p. 714; 2 Sedgwick, Damages, § 573a (9th ed. 1920). Both of these authors cite Pennsylvania cases to support their statements. They seem to be correct as to Pennsylvania law. In Pennsylvania R. Co. v. Goodman, 1869, 62 Pa. 329, 339, the court said:

"Looking at the entire charge on the subject of damages, we think it clearly confined the damages to a pecuniary compensation for the loss of Mrs. Goodman's service. The court told the jury in express language that nothing is allowable for the suffering of the deceased, nor for the wounded feelings of the plaintiff. They said also that the plaintiff's loss was to be measured by a just estimate of the services and *companionship* of the wife. It

is thought that this meant by way of solace for the loss of companionship. But all the judge said on this point made it evident he did not mean compensation by way of solace, and could not have been so understood by the jury. Companionship was evidently used to express the relation of the deceased in the character of the service she performed. He merely meant to say that the loss should be measured by the value of her services as a wife or companion. The form of expression perhaps was not the best selection of words, yet it certainly meant no more than that the pecuniary loss was to be measured by the nature of the service characterized as it was by the relation in which the parties stood to each other. Certainly the service of a wife is pecuniarily more valuable than that of a mere hireling. The frugality, industry, usefulness, attention, and tender solicitude of a wife and the mother of children, surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value."

This passage explains both the function of affection in determining the worth of the pecuniary services the wife performs, and its incompensability as a separate item. The latter proposition, as well as the former, has been reaffirmed recently. In Gaydos v. Domabyl, 1930, 301 Pa. 523, 531, 152 A. 549, 552, the court said:

"Pecuniary loss is not the same measure of damages used in an ordinary negligence case where death does not ensue. * * * [D]amages in death cases do not include a claim for mental suffering, grief or distress of mind (McHugh v. Schlosser, supra; Regan v. Davis, supra), nor for the loss of the society or companionship, as such, of children or parents. * * * "

And in Ferne v. Chadderton, 1949, 363 Pa. 191, 197, 69 A.2d 104, 107, the court said:

" * * * Under the Death Statutes the administratrix was entitled to recover for the benefit of the daughter and herself as widow the amount of the pecuniary loss they suffered by reason of decedent's death, that is to say, the present worth of the amount they probably would have received from his earnings for their support during the period of his life expectancy and while the family relationship continued between them, but without any allowance for mental suffering, grief, or loss of companionship; in other words, the measure of damages is the value of the decedent's life to the parties specified in the statute."

Appellee points out that some language in Siidekum v. Animal Rescue League, 1946, 353 Pa. 408, 418, 45 A.2d 59, includes society as well as services in the discussion of damages. But the reference immediately following is to the Gaydos case, and so presumably no change in the law was intended. We have no doubt that the more recent case of Ferne v. Chadderton, supra, stands as adequate indication of continuing judicial adherence to the traditional Pennsylvania rule. It was error for the district court to allow the jury to find damages for consortium "as such", after already having taken into account whatever extra value love and affection gives to the services of a wife. Therefore, the $3500. item for loss of consortium must be eliminated from the total recovery.

The cause will be remanded to the district court with instructions to modify the judgment by reducing the recovery allowed under the Wrongful Death Act from $35,393.87 to $31,893.87 and the total recovery from $48,887.87 to $45,-387.87; and as thus modified the judgment shall stand affirmed. No party shall be awarded costs on this appeal as against any other party.