[Crim. No. 12122. First Dist., Div. Two. May 23, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JOHN MORAN, Defendant and Appellant.

400

## COUNSEL

Allan R. Frumkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, P. J.**—Defendant, W. J. Moran, appeals from a judgment of conviction entered on a jury verdict finding him guilty of first degree murder of C. Baker and not guilty of the murder of T. Shull. He raises a question of first impression as to the propriety of the trial court's admission of a video tape of the preliminary hearing testimony of the main prosecution witness. He also asserts that the trial court abused its discretion in admitting into evidence photographs and a motion picture of the exhumation of the bodies; erred in its accomplice instructions, in the admission of the evidence of a threat to a prosecution witness by a third party, in denying his motion for acquittal as to the murder of Shull; and that the verdict was against the law as the jury rejected his defense of compulsion estab-

lished as a matter of law by the prosecution; or, in the alternative, his defense of diminished capacity established as a matter of law by the defense. We have concluded that there is no merit to any of these contentions and that the judgment must be affirmed.

As there are no contentions concerning the sufficiency of the evidence to support the verdict and judgment, a brief summary of the pertinent facts will suffice. In September 1972, Hell's Angels member William "Whispering Bill" Pifer, met an old acquaintance, Frank Tiscareno, of the Pittsburg police. Pifer had only six months to live as he had throat cancer, and explained that in January 1971, he and other members of the Richmond Hell's Angels club had buried the victims of a double murder in a deep well on a ranch in Healdsburg. In late October 1972, Pifer led the authorities to the Wethern Ranch in Mendocino County where, as Pifer had predicated, the bodies of Baker and Shull were discovered beneath earth, timbers and lime. Although both bodies had decomposed so severely since their interment that the examining pathologist could not assign a cause of death, it was clear that Baker's skull had been fractured.

Pifer was granted immunity for a wide variety of federal and state crimes and testified at the preliminary hearing in November 1972 that the murders occurred at a party after a business meeting of the Richmond Hell's Angels. At the meeting on January 15, 1971, in the clubhouse in El Sobrante, were the club president, "Rotten Richard" Barker; Frank "Badger" Mumm; "Junior" Carter; Rollin Crane; Pifer and his 16-year-old son, William, Jr.; "Big Frank" Herman; Angelo Borburia; defendant Moran and his common-law wife, Liz Ault; a woman named Carol; Chester Green; and the two victims, Tom Shull and Charlie Baker. Shull and Baker had been invited to the meeting by Green and arrived with him about 6 p.m.

After the business meeting, Barker decided to throw a party and supplied cocaine, which was snorted through a rolled-up $100 bill. Other drugs were also in general use. After Shull and Baker were sent out for beer and whiskey, Barker and Green slipped about 10 LSD tablets into Shull's coffee and a similar number into Baker's beer. About 6 o'clock the following morning, Shull became hysterical and paranoid; everyone began "playing games with his mind."

After Shull had been provoked to violence, Barker ordered: "Grab that son-of-a-bitch." Defendant and others held Shull while Barker telephoned club member Spann for seconal tablets to quiet Shull. The members attempted to force the tablets down Shull but he spat them out. For about

45 minutes, everyone took turns holding him down and trying to knock him out, but without success; there was blood all over the place. At Barker's direction, Shull was hog-tied and carried into a bedroom.

About 7:45 a.m., Barker summoned Green, who had left the party five hours earlier. When Green entered the clubhouse, he saw Shull screaming, hysterical and bleeding and struggling to remove his bonds. When Green suggested that Shull be taken to a hospital, Barker refused. A few moments later, Pifer emerged from the bedroom and told Barker that Shull was dead. Barker, Crane and defendant then went into the bedroom to verify this fact.

When Barker returned from the bedroom to the living room where Baker was seated, Barker pulled out his gun and instructed Pifer to kill Baker as "we don't want no witnesses." Pifer refused. When Baker stood up, Crane knocked him down by hitting him on the head with a chair leg. Defendant then strangled Baker at Barker's direction for about 15 minutes with his hands and then his belt. After remarking "This guy don't want to die," defendant finally placed a rope around Baker's neck, inserted a stick and twisted it. Green and young Pifer left the room.

Baker's body was subsequently stored with Shull's in the bedroom closet. Defendant joined the others in the removal of the blood-stained furnishings of the clubhouse and clean-up. The following Monday, the two bodies were stuffed into the trunk of Green's Cadillac, taken to the Wethern Ranch and buried by Crane, Pifer, Sr., Carter and Green, with Mitten and Barker both armed and standing guard. Carter was originally charged with the murders along with defendant; Green and Mitten were charged as accessories. Green testified for the prosecution at the trial.

Defendant testified that he never touched Shull and could not remember strangling Baker. He did, however, remember seeing Barker with a rope around Baker's neck. He also recalled seeing Baker lying on the floor and Barker saying "Get this guy out of here." Defendant was able to assist in removing Baker's body but could not remember any of the events of the evening or morning as he was bloated with large amounts of whiskey and drugs. Defendant repeatedly acknowledged that he would do as Barker directed to maintain his membership in the Hell's Angels and to keep his Hell's Angels "patch," his status symbol.

The major contention on appeal concerns the admission into evidence of the eight-hour video tape of Pifer's preliminary hearing testimony.[1] The question is one of first impression in this state.

---

[1]The preliminary hearing was video taped pursuant to California Rules of Court, rule 980(c). California Rules of Court, rule 980 provides: "(a) Photographing, re-

The record indicates that immediately after the prosecution indicated that it planned to introduce the video tape, defendant objected on several grounds, discussed below. Defendant clearly indicated that if the court determined that the video tape was admissible, the entire tape should be admitted into evidence without the excision of any portions contrary to the suggestion of the prosecution.

When defendant raised the threshold question of Pifer's availability for the trial, his physician, Dr. Cohen, indicated that Pifer had just been admitted to the hospital and was near death. In fact, Pifer died during the first days of the jury trial.[2] Pifer's condition was known at the time of the preliminary. Accordingly, it "was assumed by all concerned that Pifer would be dead by the time of trial." Defendant's counsel at the preliminary, Mr. Russell, indicated that his cross-examination of Pifer would be "considerably more lengthy" than that of the other attorneys. Mr. Russell was true to his word and made extensive efforts to impeach Pifer on the basis of his prior acts· of misconduct, his consumption, sale and transportation of narcotics, the grant of transactional immunity for all state and federal offenses, his prior statements, his physical condition and motive for testifying,[3] and his bias against defendant.

The record indicates that the entire eight hours of the video tape was carefully previewed by the court and all counsel. Almost the entire week of pretrial proceedings was spent on the viewing, and discussion of the issues relating to the video tape. The trial court then ruled that the entire video tape would be admitted. Thereafter, the parties stipulated that no additional reporter's transcript of the video tape was to be made at the trial since there was a correct transcript already in existence.[4] Prior to the

---

cording for broadcasting and broadcasting shall not be permitted within the courtroom while court is in session or during any mid-morning or mid-afternoon recess except as provided in subdivision (b) hereof.

"(b) Photographing, recording for broadcasting and broadcasting of judicial proceedings may be permitted by the court and under its supervision if such proceedings are designed and carried out primarily as ceremonial proceedings.

"(c) Photographing, recording for broadcasting and broadcasting within the courtroom when not prohibited by this rule shall be subject to such limitations as the court may prescribe."

[2] Dr. Cohen also indicated that when he originally examined Pifer in November 1972, he then estimated that Pifer had only about five weeks to live.

[3] Pifer refused to testify until after he was granted complete immunity; subsequently, he asserted that his main motive was to prevent charges against his son.

[4] We have augmented the record to include the transcript and have also viewed the video tape to satisfy ourselves as to all of the questions raised (cf. *People* v. *Spencer*, 60 Cal.2d 64, 79 [31 Cal.Rptr. 782, 383 P.2d 134]). We noted that in some instances, the tape was more accurate than the transcript in which some words had been juxtaposed. We noted that while the questions and answers were clearly audible, the same was not consistently true of the objections and the court's rulings.

playing of the video tape before the jury, an extensive foundation was laid as to qualifications and exact procedures (including placement of the microphones) followed by J. P. Reisinger, the special agent who recorded the video tape. Reisinger explained that Mr. Corson, an experienced and qualified lip reading interpreter, was used on the sound portion to clarify some of Pifer's whispered words on the tape. At all times, the court and counsel took extreme care to assure that everyone had a good view. Defendant expressly consented to the showing of the cross-examination of Pifer by all counsel. During the showing Reisinger identified every reel.

■ Defendant, citing *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], and *Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074], first contends that the use of the tape improperly deprived him of his Sixth Amendment right of confrontation. There is no merit to this contention. It is well established that pursuant to Evidence Code sections 1290-1291, the testimony of an unavailable witness at the preliminary hearing is "former testimony" and may be admitted at the trial. (*People* v. *Benjamin,* 3 Cal.App.3d 687, 694 [83 Cal.Rptr. 764].) The requirements of the confrontation clause are satisfied if at the prior hearing the accused was afforded a complete and adequate opportunity to cross-examine (*California* v. *Green,* 399 U.S. 149, 165-168 [26 L.Ed.2d 489, 501-503, 90 S.Ct. 1930]). In the instant case, there is no question as to Pifer's unavailability at the trial. Nor, in view of the knowledge of Pifer's condition at the time of the preliminary, the announced expectation that the testimony would be used at the trial, and the unusually extensive cross-examination, was there any denial of confrontation rights.[5]

Defendant asserts that in any event, he was unduly prejudiced in view of the tactical considerations and purpose of the preliminary that involved four defendants, including Green, who later turned state's evidence. He further asserts that he had been lulled into a false sense of security (i.e., that the video tape would not be used) since a transcript of the preliminary had already been prepared. We think that under the particular circumstances of this case, detailed above, the trial court did not abuse its discretion in overruling these objections.

■ Defendant's contention concerning the "video tape" form of Pifer's testimony presents a question of first impression in this state.[6] He asserts

[5]This is consistent with the interpretation that under *Green,* "the factfinder's observation of the witness' confrontation with the defendant is not constitutionally required." (*The Supreme Court, 1969 Term,* (1970) 84 Harv.L.Rev. 1, 115.)

[6]We may take judicial notice of the existence of a special State Bar Committee on Video Tape and Judicial Proceedings and recent experiments with video-taped trials conducted in this state (Evid. Code, § 452). To date, the work of the committee, like most of the commentators, has focused on video tapes in civil proceedings.

that the trial court abused its discretion in permitting Pifer's testimony to be presented to the jury in this form rather than in the usual reading of the transcript. He also argues that the tape was admitted below without any of the elaborate procedural safeguards that have been established by the courts of other jurisdictions in the past few years. He also urges that he was deprived of due process as the video-tape medium unduly distorts the appearance and demeanor of its subject and, therefore, does not accurately transmit the demeanor of the witness and the dramatic components of the testimony.

Significantly, neither side has cited to us any specific provisions of California law that expressly authorizes the use of video tapes.[7] However, Evidence Code section 250 provides: " 'Writing' means handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof."

Video-tape recording differs from the ordinary methods of recording images in permanent form in that the image is recorded electronically rather than photographically. Instead of relying on light rays to convey an invisible image, which is then revealed through a chemical process as does standard photography, video tape employs a process whereby the image is sensed by the camera and changed into electrical impulses which can be recorded on the tape. Thus, as in sound recording, the tape used in video recording does not have to be processed and thus can be replayed instantly. Moreover, video tape can also be used to provide either still or motion pictures. 2 Scott, Photographic Evidence: Preparation and Presentation (2d ed. 1974 Supp.) § 714, pp. 9-11.)

Recently, recordings and photographic transparencies have been held within the scope of the statute (*People* v. *Kageler,* 32 Cal.App.3d 738 [108 Cal.Rptr. 235]; *People* v. *Enskat,* 20 Cal.App.3d Supp. 1 [98 Cal.Rptr. 646]). Even before the Evidence Code, our Supreme Court held that with

---

[7]For example, since 1970, the Federal Rules of Civil Procedure, rule 30(b)(4), applicable to criminal cases pursuant to Federal Rules of Criminal Procedure, rule 15(a), specifically authorize the taking of depositions by other than stenographic means (*Carson* v. *Burlington Northern Inc.* (D.Neb. 1971) 52 F.R.D. 492; *Kallen* v. *Nexus Corporation* (E.D.Ill. 1972) 54 F.R.D. 610); since January 15, 1972, Ohio has expressly permitted the use of video tape evidence (Ohio R.Civ.P. 40); specific guidelines are provided by Ohio Supreme Court Rule 15 (see Shutkin, *Videotape Trials: Legal and Practical Implications* (1973) 9 Colum. J. of L. & Soc. Prob. 363 et seq.). The Michigan Supreme Court recently adopted a comprehensive rule to permit the use of video tape (Mich.Ct.R. 315). (See *Videotape—The Michigan Experience,* 24 Hastings L.J. 1.)

a proper foundation and authentication, a film may be admitted not merely as illustrated evidence of a human witness but as substantive evidence of the commission of the criminal acts charged (*People* v. *Bowley,* 59 Cal. 2d 855, 861 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178]; *People* v. *Bowley,* 230 Cal.App.2d 269 [40 Cal.Rptr. 859]). The courts of this state have long sanctioned the use of sound motion pictures (*People* v. *Hayes,* 21 Cal.App.2d 320 [71 P.2d 321]; *People* v. *Dabb,* 32 Cal.2d 491 [197 P.2d 1] (re-enactment of crime); and sound recordings (*People* v. *Spencer,* 60 Cal.2d 64 [31 Cal.Rptr. 782, 383 P.2d 134]).

We conclude therefore, that by enacting the more liberal concept of a writing in the Evidence Code, the Legislature of this state (where the motion picture industry and its more recent off-shoot, the television industry have flourished) recognized the widespread use of video tape in our society and its relevance to legal proceedings (cf. Kornblum, *Videotape in Civil Cases,* 24 Hastings L.J. 9, 11).

The leading and most thoughtful case on the use of video tapes in criminal proceedings is *Hendricks* v. *Swenson* (8th Cir. 1972) 456 F.2d 503, where the court held that the use of a video-taped confession in a first degree murder case did not impringe on a defendant's Fifth Amendment rights, where the statement was freely and voluntarily given and a proper foundation was laid. The court referred to the recently amended Federal Rules of Criminal Procedure, the rules requiring a person in lawful custody to submit to photographing and reviewed the history of the use of motion pictures in criminal proceedings.

After an extensive citation of authorities, the court said at 506: "Differing with our colleague, we suggest that a video tape is protection for the accused. If he is hesitant, uncertain, or faltering, such facts will appear. If he has been worn out by interrogation, physically abused, or in other respects is acting involuntarily, the tape will corroborate him in ways a typewritten statement would not. Instead of denying a defendant his rights, we believe it is a modern technique to protect a defendant's rights.

"We do not agree with our colleague as to the need for make-up and other preparation to project a better image. To permit the applying of make-up would defeat the true purpose of a statement which is to present the facts as they are. It would place in the hands of any person willing to alter evidence the opportunity to eliminate cuts, bruises, or other signs, if any, of mistreatment.

"If a proper foundation is laid for the admission of a video tape by showing that it truly and correctly depicted the events and persons shown,

and that it accurately reproduced the defendant's confession, we feel that it is an advancement in the field of criminal procedure and a protection of defendant's rights. We suggest that to the extent possible, all statements of defendants should be so preserved.

"The dissent attempts to lump the video taping of a confession with all forms of visual aids or entertainment, such as televison or movies. However, the video tape in question here is *not* a television broadcast or movie designed to entertain or manipulate an audience. It is *not* merely a 'packaging device for consumers,' as stated by Marshall McLuhan in referring to the press, movies, and radio. McLuhan, in his book quoted in the dissent, is talking about the electronic media's vast impact on today's audiences and of the vast opportunities to educate those audiences by means of the media.

"This does not mean that the principles to be employed in making it a more effective device for education defeat its use to correctly detail a voluntary confession.

"The dissent also indirectly calls attention to the television experiences of a certain Presidential candidate. We do not see a trial as a stage appearance or as a campaign presentation. We believe it a part of the procedure for obtaining justice, and emphasize the importance of a trial truly presenting the facts as they exist. We believe that this is best done whether video tape is used or whether the witnesses testify in court by presenting the events and the parties as they are."

After noting that it did not think a video tape was any more prejudicial to a defendant than the constitutionally permissible use of still photographs or blood or urine samples, the court continued at 507: "We must recognize that the capacity of persons to observe, remember and relate varies as does their ability and desire to relate truly. For jurors to see as well as hear the events surrounding an alleged confession or incriminating statement is a forward step in the search for the truth. And after all, the end for which we strive in all trials is 'that the truth may be ascertained and the proceedings justly determined.' "[8]

In *State* v. *Newman,* 4 Wn.App. 588 [484 P.2d 473, at page 477], the Washington appellate court sanctioned the use of video-taped lineup evidence on the basis of the same and less cumbersome foundation required

---

[8]Significantly, the dissent in *Hendricks* (at pp. 507-509) focusing on the medium's unusual technical aspects (distortions), its powerful emotional effect and unusual sensory effect of fleeting images suggested that a video tape came dangerously close to self-incrimination, and therefore recommended additional minimal standards for the use of video-taped confessions.

for motion pictures and photographs, rather than the more stringent standard for sound recordings as the defense urged. The Washington court relied on *Paramore* v. *State* (Fla.) 229 So.2d 855. Recently, a Florida appellate court was faced with the identical question here presented and resolved it in favor of the use of video tape (*Hutchins* v. *State* (Fla.App. 1973) 286 So.2d 244 (rehg. den. Dec. 20, 1973.)

Another consideration was mentioned in *Rubino* v. *G. D. Searle & Co.* (1973) 73 Misc.2d 447 [340 N.Y.S.2d 574], quoting from *Carson* v. *Burlington Northern Inc.,* 52 F.R.D. 492, and noted at page 576: " ' "[T]he finder of fact at trial often will gain greater insight from the manner in which an answer is delivered and recorded by audio-visual devices. Moreover, a recording, a video tape, or a motion picture of a deposition will avoid the tedium that is produced when counsel read lengthy depositions into evidence at trial." . . .' "

Defendant attempts to argue that the use of the video tape in the instant case was error and particularly prejudicial in view of the seriousness of the offenses charged. As indicated above, the use of video tape in murder prosecutions has been sanctioned in other jurisdictions. We have indicated that we think the video tape of Pifer's testimony fulfilled the broad purposes of the confrontation clause and, therefore, need not consider defendant's additional assertion that the instant case is distinguishable from all of the other reported cases as the person video taped (usually the defendant) was available for cross-examination at the trial.

We turn next to defendant's due process contentions concerning the technical distortions of the medium and its failure to accurately transmit the demeanor of the witness and the dramatic components of the testimony. In general, the advantages and disadvantages of the "filtering" effect of the medium fall equally on both sides. Therefore, its use is "fair" and there is no inherent unfairness (*Estes* v. *Texas,* 381 U.S. 532, 542-543 [14 L.Ed. 2d 543, 549-551, 85 S.Ct. 1628]).[9] Conceding that testimony through a television set differs from live testimony, the process does not significantly affect the flow of information to the jury (see 26 Stan.L.Rev. 619, fns. 29-30, at p. 623). Video tape is sufficiently similar to live testimony to permit the jury to properly perform its function. Fair new procedures that facilitate proper factfinding are allowable, although not traditional (*Byrne* v. *Matczak* (3d Cir. 1958) 254 F.2d 525, at pp. 528-529). In any event, we do not comprehend defendant's contention that the tape is less valid

---

[9]Even assuming that Pifer was made to look "rougher" by the video taping process, it could only inure to the benefit of defendant here.

or less reliable than the reading of the written transcript of the preliminary hearing.

We agree with the federal court in Hendricks that the video tape is a modern technique that better protects the rights of all concerned. We can also take judicial notice of the fact of the ubiquity of television sets, as revealed by the 1970 census,[10] and recent availability of low-cost television cameras[11] (Evid. Code, § 452, subd. (h)). With such a widespread availability of television comes a familiarity with its technical characteristics and distortions. Indeed, the television camera is a stranger only in the slower moving apparatus of justice.

We have weighed all of defendant's contentions and reiterate that all of the procedural safeguards established by the law of this state for photographs and motion pictures were followed in exemplary fashion by the trial court and counsel. The entire tape was carefully previewed by the court and counsel before its presentation to the jury and all motions and objections were carefully and thoroughly considered at that time. Prior to the viewing of the tape by the jury, a careful foundation was laid as to its technical aspects, accuracy and reliability. The ability of all concerned to see the video tape was carefully monitored. The entire eight hours were presented to the jury so that there were no opportunities for any misrepresentations of the testimony by editing or shortcutting. We think with all of these safeguards, the video tape of Pifer's preliminary hearing testimony was properly admitted.

Defendant next contends that the trial court abused its discretion by admitting into evidence the photograph and short film pertaining to the exhumation of the bodies. The record indicates that the pictures were offered to buttress the credibility of Pifer's testimony and to corroborate the testimony of the autopsy surgeon. The defense objected on grounds that the photographs were gory and irrelevant, inflammable and prejudicial. The trial court reviewed the photographs and the motion picture and concluded that the motion picture was nonprejudicial and free from any gross matters that could be inflammatory and admitted it. The court also carefully reviewed the photographs and then exercised its broad discretion pursuant to Evidence Code section 352, admitted 15 of the photographs and excluded 7. The admission of both the photographs and the motion pic-

---

[10]Ninety-six percent of all households had at least one black and white television set (Statistical Abstract of U.S. 1973, U.S. Dept. of Commerce (July 1973) p. 499).

[11]The cost of equipment for making and showing black and white video tape is comparable to the cost of 16 mm motion picture film (Scott, Photographic Evidence, *supra*).

ture was within the sound discretion of the trial court and its ruling will not be reversed unless the probative value is clearly outweighed by the prejudicial effect (*People* v. *Murphy*, 8 Cal.3d 349 [105 Cal.Rptr. 138, 503 P.2d 594]). No abuse of discretion was shown here. Most of the photographs were not of the bodies but of the grave sites. The evidence was not cumulative as it permitted the prosecution to show that the bodies sustained no damage during the recovery procedures. Although counsel on both sides admitted that some of the photographs were gory, the nature of the case precluded the possibility of any other kinds of evidence. Hideous and grotesque photographs have been held properly admissible where relevant and not unduly prejudicial (*People* v. *Smith*, 33 Cal.App.3d 51 [108 Cal.Rptr. 698]; cf. *People* v. *Terry*, 2 Cal.3d 362, 403 [85 Cal.Rptr. 409, 466 P.2d 961]).

In addition, defendant contends that the film should have been excluded because the district attorney did not tell the defense about it until after formal discovery proceedings were concluded. The record indicates that the prosecution and defense counsel had discussed the photographs and at one time the prosecution indicated there was nothing else. Subsequently at the trial, the prosecution reversed its intent to introduce the color film. Defense counsel expressed surprise but did not seek a continuance to investigate and produce available rebuttal evidence (*People* v. *McRae*, 256 Cal.App.2d 95, 102-105 [63 Cal.Rptr. 854]). The record indicates no indication of wilful misconduct or bad faith by the prosecution to disclose the film. The film furthermore was simply a more complete depiction of the photographs that the defense had already seen. Accordingly, there was no error in admitting the film into evidence.

Defendant next contends that the court erred to his prejudice by failing to instruct the jury that Pifer, his son and Green were also accomplices as a matter of law to the murder of Baker. The record indicates that the court instructed the jury that: 1) accomplice testimony was to be distrusted and required corroboration; 2) an aider and abettor was guilty as a principal; and 3) as a matter of law, Pifer was an accomplice to the murder of Shull. The proper standard for an accomplice was recently discussed by our Supreme Court in *People* v. *Gordon*, 10 Cal.3d 460 at pages 466-467 [110 Cal.Rptr. 906, 516 P.2d 298]. The court indicated that the mere fact that a witness was liable to prosecution for the identical offense charged against the defendant at the time the acts are committed did not establish the accomplice status. In order to be included within the definition of an accomplice, the witness must have "guilty knowledge and intent" with regard to the commission of the crime. In the instant case, the trial court properly concluded that whether Pifer, Sr., his son and Green were accomplices in the murder of Baker were considerations of fact for the

jury. The complicity of each was disputed and reasonably susceptible to a contrary inference.

Although Green invited Shull and Baker to the meeting, there was evidence that his invitation was innocent. He had warned them to avoid any "trick bag"[12] and then told the club members to treat the visitors well. Green left the clubhouse at 2:30 a.m. and did not return until after Shull had been carried to the bedroom and suggested to Barker that Shull be taken to a hospital. Green also testified that when Barker ordered Baker's death, he began to intervene to stop it and then left the room while defendant strangled Baker.

Pifer, Jr., feared for his own safety as he was not a member of the motorcycle club, and attempted to remain inconspicuous. He also left the room when defendant applied the rope and stick to Baker. Pifer, Sr., refused when Barker ordered him to kill Baker. This refusal was strong evidence that Pifer did not share the intent of the others and, therefore, was not an accomplice (*People* v. *Crary,* 265 Cal.App.2d 534, 541 [71 Cal.Rptr. 457]). Mere presence, knowledge of the crime or failure to attempt to prevent it does not suffice to make one an aider or abettor and, therefore, an accomplice (*People* v. *Williams,* 10 Cal.App.3d 638, 641 [89 Cal.Rptr. 143]). We conclude that as to Baker's murder, the accomplice status of Pifer, his son and Green were properly left to the jury as questions of fact.

Defendant next complains that over his objection, the prosecution was permitted to elicit from its witness Green testimony concerning a pretrial jail house visit from Hell's Angel Richard "Indian" McGill. McGill told Green he was no longer a member and warned him not to testify about any one member of the Hell's Angels club. The record indicates that the trial court promptly instructed the jury that this hearsay item was to be considered only for the purpose of showing background and motivation, incentive or other facts that resulted in Green's decision to testify. The prosecution did not attempt to show that defendant authorized McGill's action. In fact, it was shown that Green was no longer a member of the motorcycle club and had been granted immunity. Defendant contends that the evidence was not properly admitted, even for the limited purpose of assessing the credibility of Green. As indicated above, Green was originally charged as an accessory to the murders, had suffered prior convictions, and subsequently turned state's evidence. Accordingly, his credibility was a major issue at the trial.

Defendant cites *People* v. *Terry,* 57 Cal.2d 538 [21 Cal.Rptr. 185,

---

[12]The term refers to a form of harassment that requires the subject to assert his manhood to escape from his predicament.

370 P.2d 985], and other authorities in each of which the jury was permitted to infer that a prosecution witness had been threatened or improperly influenced by a representative of the particular defendant and from that inference to further infer a consciousness of guilt. The instant case, however, is more like *People* v. *Woodberry,* 10 Cal.App.3d 695, 709-710 [89 Cal.Rptr. 330], where, unknown to the defendant, the witness, a Black Panther, was threatened by other Black Panthers. This evidence was admitted for the purpose of explaining the witness' refusal to continue testifying. Here, also, Green's testimony concerning the threat was relevant and could have aided the jury in evaluating his decision to testify for the prosecution. In view of the court's immediate caution and the overwhelming evidence of defendant's guilt, even if the evidence was erroneously admitted, it was not prejudicial (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]).

■ Defendant also argues that the trial court erred to his prejudice by denying his motion for a judgment of acquittal on count One relating to the murder of Thomas Shull. He urges that the trial court's denial of the motion at the close of the prosecution's case in chief was prejudicial error. The simple answer to the contention is that defendant was acquitted by the jury of the murder of Shull. He further argues, however, that there was insufficient substantial evidence of malice or intent on his part to torture or inflict cruel suffering on Shull.

As our above summary of the pertinent portions of the record indicates, there was substantial evidence to sustain a conviction of defendant's participation in the murder of Shull. Pifer indicated that defendant participated in holding down Shull and beating him for about an hour. Green described the hog-tied Shull as screaming, hysterical, bleeding and with lumps all over his head and face. Barker, whom defendant aided and abetted, refused medical care to Shull. From these circumstances, the jury could imply defendant's malice with respect to Shull (*People* v. *Mattison,* 4 Cal.3d 177, 182 [93 Cal.Rptr. 185, 481 P.2d 193]; *People* v. *Ricketts,* 7 Cal.App.3d 441, 446 [86 Cal.Rptr. 647]).

Finally, defendant contends that the verdict was contrary to law as his asserted defenses of compulsion were established as a matter of law by the witnesses for the prosecution or, in the alternative, that his defense of diminished capacity was established as a matter of law by the testimony of his own witnesses. The record indicates that the trial court properly instructed the jury as set forth below[13] on intoxication, unconsciousness and compulsion.

---

[13]"In the crime of murder of which the defendant is accused, a necessary element is the existence in the mind of the defendant of the specific intent to kill a human being with malice aforethought.

As to the defense of diminished capacity and intoxication, the record indicates that defendant's expert, Dr. Joel Fort, indicated that if in fact defendant had ingested the amount of drugs and alcohol claimed for the time in question, defendant would have been so intoxicated as to be unable

"If the evidence shows that the defendant was intoxicated, at the time of the alleged offense, the jury should consider his state of intoxication, in determining if defendant had such specific intent.

"If from all the evidence, you have a reasonable doubt, whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent.

"Intoxication of a person is voluntary if it results from his willing partaking of any intoxicating liquor, drug or other substance when he knows that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect as a possibility.

"Intoxication is involuntary when it is produced in a person without his willing and knowing use of intoxicating liquor, drugs or other substance, and without his willing assumption of the risk of possible intoxication.

"Proof of the involuntary intoxication of a defendant should be considered by the jury in determining whether the defendant had the capacity or ability to commit any crime or to form a criminal intent at the time the crime is alleged to have been committed.

"[Involuntary intoxication should also be considered in determining the existence of any motive or purpose for the commission of the alleged offense.]

"In the crime of murder by torture of which the defendant is accused [in Count 1 of the information], a necessary element is the existence in the mind of defendant of knowledge that his conduct endangers the life of the victim.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such knowledge.

"If from all the evidence you have a reasonable doubt whether defendant had such knowledge by reason of a state of intoxication, you must give the defendant the benefit of that doubt and find that he did not have such knowledge.

"In the crime of murder by torture, of which the defendant is accused in Count 1 of the information, a necessary element is the existence in the mind of the defendant of knowledge that his conduct endangered the life of the victim.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such knowledge.

"If from all the evidence you have a reasonable doubt whether defendant had such knowledge by reason of a state of intoxication, you must give the defendant the benefit of that doubt and find that he did not have such knowledge.

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind.

"If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious.

"However, if, notwithstanding the defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious.

"A person is not guilty of crime when he commits an act or engages in conduct,

to premeditate, entertain malice, appreciate the difference between right and wrong or even recognize that he was engaging in acts that had a high probability of resulting in another's death. Dr. Fort, however, acknowledged that he was relying on information furnished by defendant and that defendant's statement that the victim would not die made during the strangulation of Baker would tend to show a recognition of what was happening.

Accordingly, the question of defendant's diminished capacity was properly left to the jury.

■ As to the defense of compulsion, Green testified that when Barker directed the killing of Baker, he pointed a gun at Pifer and defendant. Defendant, however, stated he never saw the gun and Dr. Fort indicated that even if displayed, the gun would have been irrelevant to defendant, given his condition. In addition, Dr. Fort explained that the Hell's Angels patch was defendant's "status badge." Defendant repeatedly acknowledged that he would do as Barker directed in order to maintain his membership in the Hell's Angels. Thus, the defense of compulsion was also not established as a matter of law.

■ The People raise the additional question of whether because of the temporary abolition of the death penalty (*People* v. *Anderson,* 6 Cal.3d 628, 657, fn. 45 [100 Cal.Rptr. 152, 493 P.2d 880]) after the murder of Baker but before defendant's trial, the defense was available at all to defendant at the trial. Penal Code section 26, so far as pertinent, provides: "All persons are capable of committing crimes except those belonging to the following classes: . . .

"Eight. Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

The People for the first time on appeal urge that the subsequent judicial abolition of the death penalty could not create a defense that did not exist at the time of trial. *People* v. *Anderson, supra,* footnote 45, at page

---

otherwise criminal, when acting under threats and menaces under the following circumstances:

"1. Where the threats and menaces are such that they would create in the mind of a reasonable person the fear that his life would be in imminent and immediate danger, if he did not commit the act or engage in the conduct charged, and

"2. If such person then believed that his life would be so endangered.

"This rule does not apply to threats, menaces, and fear of future danger to his life."

657, was made fully retroactive. The abolition of the death penalty rendered meaningless the exception pertaining to capital crimes of Penal Code section 26, subdivision Eight (Witkin, Cal. Crimes (1973 Supp.) § 155, p. 81).

Accordingly, the defense of compulsion was available to defendant at the time of trial. We conclude that the trial court properly concluded that the availability of the defense was a question of law.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied June 17, 1974, and appellant's petition for a hearing by the Supreme Court was denied July 17, 1974