**Richard A. BARKER, Petitioner-Appellant,**

v.

**Paul MORRIS, Warden, California State Prison at Folsom, et al., Respondents-Appellees.**

No. 83–1749.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1983.

Decided May 24, 1985.

Eleanor M. Kraft, Vacaville, Cal., for petitioner-appellant.

Clifford K. Thompson, Jr., Deputy Atty. Gen., San Francisco, Cal., for respondents-appellees.

Before KENNEDY and REINHARDT, Circuit Judges, and HOFFMAN,* District Judge.

KENNEDY, Circuit Judge:

The case before us presents a question requiring the interpretation of the Confrontation Clause of the Sixth Amendment of the United States Constitution. The appeal is from a denial of habeas corpus relief in the district court, after California courts, rejecting direct and collateral attacks, affirmed Richard Barker's convictions for murder in the first degree and for involuntary manslaughter. We conclude that admission at trial of sworn videotaped testimony by an eyewitness who died prior to trial did not violate the Confrontation Clause, because of the necessity for the testimony and the particular guarantees of

---

* Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

trustworthiness attached to it. We affirm the district court's denial of the writ.

The deceased witness, "Whispering Bill" Pifer, had been a member of the Richmond (California) chapter of a motorcycle club called the Hell's Angels. He and other chapter members, including Richard Barker, Edward Carter, Rollin Crane, Chester Green, and William Moran, were present at their clubhouse on January 15, 1971 and witnessed the homicides and the surrounding events. Baker and Shull were guests of the club, or so they supposed until becoming its victims.

The petitioner, Richard Barker, was the chapter president. Barker and Crane put ten tablets of LSD in the drinks of the two guests, Shull and Baker. Shull became uncontrollable, and, on Barker's orders, he was beaten severely, tied, and carried to a back room, where he died. To eliminate a potential witness, Barker ordered other club members to kill Baker. Crane hit Baker on the head with a chair leg, and, while Barker supervised, Moran and Crane strangled Baker to death. The victims' bodies were hidden in a well at a ranch site two days later. A more detailed recitation of the crimes is contained in *People v. Moran*, 39 Cal.App.3d 398, 114 Cal.Rptr. 413 (1974).

Nine months after the crimes, "Whispering Bill" Pifer, knowing he would soon die of throat cancer, contacted the police and described the murders. He led them to the site where the bodies of Baker and Shull had been hidden, and the remains were discovered. Barker, Crane, Moran, and Green were indicted, but only the latter two were immediately apprehended. Barker and Crane had become fugitives.

Granted immunity from a wide-range of federal and state crimes, Pifer testified at a preliminary hearing in the proceedings against Moran and Green. Because Pifer was expected to live only a matter of weeks, the state court permitted his entire testimony to be videotaped. Defense counsel for the apprehended suspects conducted extensive cross-examination, all recorded on the videotape. No attorney represented the fugitive Barker. Green and Moran were tried, and soon after their trial began Pifer died. Barker was arrested in Michigan approximately two years after the indictment. After Barker's apprehension, he was brought to trial and the prosecution introduced Pifer's videotaped testimony. Green, Moran, and William Pifer, Jr., who also was present at the clubhouse when the homicides occurred, testified at trial. Their testimony was consistent with the recorded testimony of "Whispering Bill" Pifer.

After conviction, Barker exhausted his state court remedies on both direct and collateral review. In a state habeas proceeding, the California Court of Appeal, although holding that the videotape was inadmissible under the California Evidence Code, dismissed the petition under the harmless error doctrine. The state court considered the videotape to be merely cumulative in view of the overwhelming evidence introduced against Barker and, consequently, rejected Barker's challenge under the Confrontation Clause. The state court's conclusion regarding inadmissibility under the California Evidence Code is binding on us in this proceeding. *See* 28 U.S.C. § 2254(a) (1982).

■ The complete trial transcript is not part of the record on this appeal, and we have not examined it exhaustively to determine whether there was sufficient independent testimony to render the admission of the videotape harmless. The question would be a close one in any event since Green and Moran were accomplices and had a motive to shift blame to Barker. Barker would have more difficulty in discrediting "Whispering Bill" Pifer's testimony on this ground because Pifer had been granted immunity and the state could present him as a more disinterested witness. While "Whispering Bill" may have had some incentive to protect his son who was also present at the scene of the crime, *see Moran,* 39 Cal.App.3d at 405 n. 3, 114 Cal.Rptr. at 417 n. 3, his self-interest was not as great as that of the live witnesses. We need not consider the question of harm-

less error, however, for we conclude that introduction of the videotaped testimony did not violate the Confrontation Clause. We turn now to our analysis of the confrontation doctrine.

■ Although the Sixth Amendment Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him, the clause is given a pragmatic rather than a rigid, literal construction. As the federal courts have construed the Confrontation Clause, it neither bars the admission of all out-of-court statements in a criminal proceeding nor requires that all declarants be subject to cross-examination either before or during trial. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980); *United States v. West*, 574 F.2d 1131, 1136–37 (4th Cir.1978); *Hoover v. Beto*, 467 F.2d 516, 532 (5th Cir.) (en banc), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972).

■ The Confrontation Clause promotes accuracy in the criminal process by ensuring that the trier of fact has a satisfactory basis for evaluating the truth of out-of-court statements. *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (plurality opinion); *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970). It permits the introduction of out-of-court statements if they are both necessary and reliable. "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'" *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

The testimony was necessary in the sense that it was qualitatively different from the testimony of Green and Moran, who were charged as accomplices and whose motives for testifying differed from "Whispering Bill" Pifer's in significant respects. The prosecution could have concluded that Pifer's testimony was necessary to present the trier of fact with a more complete and somewhat better bal-

anced view of the evidence than that which would have emerged had it relied solely on the testimony of Green and Moran. On account of Pifer's death, this testimony could be presented only through the use of the videotape or the recorded transcripts of his testimony.

Our principal area of inquiry, therefore, concerns the reliability of Pifer's videotaped testimony. Although the videotaped testimony is analogous to several well-established hearsay exceptions, *see, e.g.*, *Mancusi v. Stubbs*, 408 U.S. 204, 213–16, 92 S.Ct. 2308, 2313–15, 33 L.Ed.2d 293 (1972) (former testimony); *Mattox v. United States*, 156 U.S. 237, 243–44, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895) (dying declarations); *United States v. Monaco*, 735 F.2d 1173, 1175–76 (9th Cir.1984) (reserving whether the statement against interest exception is firmly rooted), it does not fall within any firmly rooted hearsay exception. *See, e.g.*, Fed.R.Evid. 804(b)(1) (former testimony); Cal.Evid.Code §§ 1290–1292 (West 1984) (same); Fed.R.Evid. 804(b)(2) (dying declaration); Cal. Evid.Code § 1242 (same); Fed.R.Evid. 804(b)(3) (statements against interest); Cal. Evid.Code § 1230 (same). We must determine whether there has been an adequate showing that the videotaped testimony had specific guarantees of trustworthiness. *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

We note that, in federal court, Pifer's videotaped testimony likely would have been admitted under Federal Rules of Evidence 804(b)(5), which allows the admission of

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be

served by admission of the statement into evidence. . . .

Pifer's testimony was offered as evidence of a material fact, and, because of the qualitative differences between his testimony and that of Green and Moran, it was more probative on the points for which offered than was the other testimony. As will be demonstrated, the testimony possessed particular guarantees of trustworthiness sufficient to meet the requirements of the Confrontation Clause. *See Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539; *United States v. McKinney,* 707 F.2d 381, 384 n. 6 (9th Cir.1983); *United States v. Nick,* 604 F.2d 1199, 1203 (9th Cir.1979) (per curiam) (Fed.R.Evid. 803(24) as a guide to satisfaction of Confrontation Clause); *West,* 574 F.2d at 1138 (congruence of Fed.R.Evid. 804(b)(5) and Confrontation Clause analysis). The California Evidence Code, however, contains no provisions comparable to Rule 804(b)(5) of the Federal Rules. *See generally* Cal.Evid.Code §§ 1200–1341. The California courts found Pifer's videotaped testimony inadmissible under the California Evidence Code.

The Confrontation Clause and the rules of evidence, particularly rules governing the use of hearsay, are concerned chiefly with assuring the requisite level of trustworthiness. The scope of the Confrontation Clause and rules of hearsay, however, are not necessarily coextensive. *California v. Green,* 399 U.S. at 155–57, 90 S.Ct. at 1933–35. Though reliability may be the crux of analysis in determining both hearsay and Confrontation Clause violations, the Confrontation Clause has acquired in our system a value separate from the assurance of reliability. In a basic sense, the Confrontation Clause is one measure of the government's obligation to present its case in a form subject to open scrutiny and challenge by the accused, the trier of fact, and the public.

■ Because of this divergence in objectives, evidence admissible under the evidentiary rules of a particular jurisdiction does not necessarily meet the requirements of the Confrontation Clause. Similarly, the admission of testimony in violation of the evidentiary rules of the particular jurisdiction does not of its own force constitute a violation of the Confrontation Clause. *California v. Green,* 399 U.S. at 155–56, 90 S.Ct. at 1933–34; *Rado v. Connecticut,* 607 F.2d 572, 578 n. 4 (2d Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980); *United States v. Eaglin,* 571 F.2d 1069, 1079–81 (9th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). That the admission of Pifer's videotaped testimony was erroneous under the California Evidence Code is not dispositive.

■ To determine compliance with the Confrontation Clause, we must examine Pifer's videotaped testimony for particular guarantees of trustworthiness. There is no mechanical test for determining the reliability of out-of-court statements. *See Roberts,* 448 U.S. at 64–65, 100 S.Ct. at 2538–39. Each case must be evaluated on its own facts. *United States v. Perez,* 658 F.2d 654, 660 (9th Cir.1981); *United States v. Carlson,* 547 F.2d 1346, 1357 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *United States v. Snow,* 521 F.2d 730, 734 (9th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). The inquiry in each case must reflect "a practical concern for the truth-determining process." *Dutton,* 400 U.S. at 89, 91 S.Ct. at 220.

Barker did not have the opportunity to cross-examine Pifer at the preliminary hearing. The absence of cross-examination distinguishes the present case from the recent pronouncements of the Supreme Court in *Green* and *Roberts.* However, this lack of opportunity is directly attributable to Barker's fugitive status. Had Barker been available at the time of cross-examination and had he been excluded from the proceeding, our analysis of the admissibility of such testimony against him might well be different from the analysis we offer below.

■ While always central to Confrontation Clause analysis and even dispositive in some cases, cross-examination is not re-

quired in every case. *Nick,* 604 F.2d at 1203 ("availability of cross-examination [is] not the sole criterion by which to test the admissibility of hearsay over confrontation clause objection"); *United States v. King,* 552 F.2d 833, 846 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). *Accord West,* 574 F.2d at 1137; *Carlson,* 547 F.2d at 1356–57; *Hoover,* 467 F.2d at 532; *see also Dutton,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (admission of uncross-examined statement by nontestifying coconspirator did not violate Confrontation Clause). Indeed, many hearsay statements contain sufficient indicia of reliability to be admissible despite the absence of cross-examination by the defendant. *See* Fed.R.Evid. 804(b)(2) (dying declarations); Fed.R.Evid. 804(b)(3) (statements against interest); Fed.R.Evid. 803(1) (present sense impressions); Fed.R.Evid. 803(2) (excited utterances); *see also King,* 552 F.2d 833 (9th Cir.1976) (statement of coconspirator which possesses sufficient indicia of reliability); *Dutton,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (same); *United States v. Fleishman,* 684 F.2d 1329 (9th Cir.) (same), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *Perez,* 658 F.2d 654 (same); *Snow,* 521 F.2d 730 (same). Thus, circumstances other than prior cross-examination of the declarant by the defendant can show evidence to be trustworthy to a degree that warrants its submission to the jury.

█ The videotaped testimony has substantial and specific guarantees of trustworthiness and reliability. The contact with law enforcement officials was initiated by Pifer, and his testimony was voluntary at all stages of the investigation. At the time of the initial contact, law enforcement officials did not know that the homicides had been committed or that Barker, Pifer, and the other persons present at the crime were involved. Voluntariness is an important index of reliability. *Steele v. Taylor,* 684 F.2d 1193, 1204 (6th Cir.1982), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983); *see Monaco,* 735 F.2d at 1177 (statements made by cohort under

an indictment arising out of the same transaction may be unreliable as they may be motivated by a desire to curry favor with authorities); *Nick,* 604 F.2d at 1204 (child's statement is reliable when directly responsive to concerned mother's question); *Hoover,* 467 F.2d at 533 (voluntariness is the first and foremost indication of the reliability of confessions). *Cf. United States v. Gonzalez,* 559 F.2d 1271, 1273 (5th Cir.1977) (declarant's grand jury testimony is unreliable where obtained by excessive prosecutorial pressure). Pifer's actual testimony, moreover, was made in open court, under oath and penalty of perjury, with an awareness of its consequences. Counsel for the defendants present reminded Pifer that his grant of immunity did not cover perjury at the preliminary hearing. These formal processes contribute to truthful testimony. *See Chambers v. Mississippi,* 410 U.S. 284, 298–99, 93 S.Ct. 1038, 1047–48, 35 L.Ed.2d 297 (1973); *United States ex rel. Haywood v. Wolff,* 658 F.2d 455, 464 (7th Cir.), *cert. denied,* 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625 (1981).

Although not necessarily within the scope of traditional evidentiary rules, Pifer's testimony exhibits indicia of truthfulness that serve as the rationales for established hearsay exceptions. Pifer testified with full knowledge and contemplation of his impending death. As the Court observed in *Mattox,* 156 U.S. at 244, 15 S.Ct. at 340, "the sense of impending death is presumed to remove all temptation to falsehood...." Pifer's testimony carries assurances of reliability similar to those which underlie dying declarations, long recognized as admissible under the Confrontation Clause. *See Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965); *Mattox,* 156 U.S. at 243–44, 15 S.Ct. at 340; *Monaco,* 735 F.2d at 1175.

Pifer's testimony also constituted an admission of his involvement in substantial criminal activities and, as such, was likely to put him in disrepute. The law has recognized that a person is unlikely to make

such admissions unless true. *United States v. Layton,* 720 F.2d 548, 560–61 (9th Cir.1983) (statement regarding intent to commit crime in the future), *cert. denied,* —— U.S. ——, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984); *Steele,* 684 F.2d at 1204 (statement recounting a life of prostitution and concealment of a murder plot). This common sense observation provides the rationale for exceptions to the hearsay rule for statements against penal interest and statements which would make the declarant the object of hatred and social disgrace. *See* Fed.R.Evid. 804(b)(3), (b)(5); Cal.Evid. Code § 1230. The "common sense recognition of human nature underlying [these] exceptions to the hearsay rule," affords a satisfactory basis for evaluating the truthfulness of out-of-court statements. *Hoover,* 467 F.2d at 533.

■ The reliability of Pifer's testimony is strongly supported by the fact of independent corroboration for each of its essential elements. Corroboration is a recognized indicium of reliability in Confrontation Clause analysis. *See United States v. Garner,* 574 F.2d 1141, 1144 (4th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *West,* 574 F.2d 1131, 1135; *Snow,* 521 F.2d at 735.

Pifer's account of the murders was corroborated by the testimony of Pifer, Jr., Green, Moran, and, in many respects, even the admissions of codefendants Barker and Crane. *See Garner,* 574 F.2d at 1144 (testimony of another witness is an important corroborating factor). There was little doubt at trial that Barker was present at the Richmond Hell's Angels clubhouse on the night of January 15, 1971; that Shull died after being given large quantities of LSD and being tied and beaten; and that Baker was strangled to death. *See Nick,* 604 F.2d at 1204 (other evidence established that defendant had the opportunity to commit the crime); *Garner,* 574 F.2d at 1144–45 (airline tickets and hotel receipts established that defendant made the trips in question). "Whispering Bill" Pifer's detailed testimony about the burial was corroborated by physical evidence discovered at the burial site and by the testimony of both Green and Moran.

Pifer's personal knowledge of the events is undisputed. He was not a casual observer but an actual participant who knew all present. *Dutton,* 400 U.S. at 88, 91 S.Ct. at 219; *Nick,* 604 F.2d at 1204 (declarant knew defendant well and was unlikely to mistake identity); *Snow,* 521 F.2d at 734–35; *Carlson,* 547 F.2d at 1354. Given the nature of the events, Pifer's account of Barker's role in the murders was not likely to be based upon a faulty recollection. *See Dutton,* 400 U.S. at 89, 91 S.Ct. at 220; *Nick,* 604 F.2d at 1204.

Barker was not represented by counsel at the videotaped preliminary hearing and Pifer was not cross-examined on Barker's behalf, but Pifer was cross-examined by counsel for the defendants present at the preliminary hearing. The cross-examination of Pifer fills over two-hundred pages of Reporter's Transcript. The defendants present challenged Pifer on numerous grounds, including his ability to perceive, to recall, and to communicate, and his motives and biases. In particular, defense counsel cross-examined Pifer on his grant of immunity; the various discrepancies between his testimony and his prior statements to the police; his failure to mention the presence of his son at the party; his prior acts of misconduct; his physical condition, including his use of drugs, at the time of the murders and at the preliminary hearing; and animosity between himself and the Hell's Angels and particular defendants, including Barker.

We do not intend to suggest that in all circumstances cross-examination during a preliminary hearing will compel a conclusion that the declarant's testimony is reliable and, hence, admissible against a defendant whose interests were not directly represented at the preliminary hearing. In our view, whether such cross-examination provides a sufficient indication of reliability turns upon whether the interests of those who were represented during cross-examination were advanced in a manner that was consistent with the interest of the defend-

ant who lacked such representation. Here, the defendants present at the preliminary hearing parted interest with Barker to a degree in that they might have sought not only to discredit Pifer but also to shift criminal responsibility for the killings from themselves to the absent Barker. On this basis, Barker contends that the cross-examination of Pifer by the other defendants was prejudicial to his interests. We cannot agree. First, the vast majority of cross-examination was directed toward discrediting Pifer in general, and could not have had the effect of shifting blame to Barker. It was entirely beneficial to his defense. Second, at trial, Barker's counsel emphasized to the jury the potentially differing interests of the preliminary hearing defendants. The jury, aware of the potential conflict, could determine for itself whether Pifer's testimony was being shaped unduly against Barker by the other defendants. Most importantly, the record itself reveals that Pifer was not interested in shifting responsibility to Barker. When specifically asked, Pifer declined to attribute responsibility solely to Barker.

Finally, the jury had the opportunity to observe both the direct and cross-examination of Pifer on the videotape. This procedure is not always a substitute for actual confrontation. We do not suggest that videotaped testimony is the same as actual courtroom testimony for purposes of the Confrontation Clause. It is not. We do not suggest what circumstances, if any, may result in the necessity for using videotaped testimony when live witnesses are physically available.

Videotaped testimony is an important tool, however, for the evaluation of the declarant's reliability where the necessity for its use has been demonstrated. Use of the videotape in this case eliminated any question whether Pifer made the out-of-court statements. *United States v. Blakey*, 607 F.2d 779, 786 (7th Cir.1979); *see also Nick*, 604 F.2d at 1204 (mother subject to cross-examination on her recollection of her child's statement). The jurors also had some opportunity to observe the demeanor of Pifer. Such observations often play a major role in a jury's assessment of credibility. *See California v. Green*, 399 U.S. at 158, 90 S.Ct. at 1935; *Mattox*, 156 U.S. at 242–43, 15 S.Ct. at 339–40; *Haywood*, 658 F.2d at 465 (Swygert, J., dissenting). In this respect, the introduction of Pifer's videotaped testimony meets a concern of the Confrontation Clause that most statements subject to prior cross-examination do not. *See Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (preliminary hearing testimony is admissible even though only in the form of a transcript); *Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (same); *Mancusi*, 408 U.S. 204, 92 S.Ct. 2308 (same with prior trial testimony).

■ Other cases may involve indicia of reliability not present here, *see, e.g., Dutton*, 400 U.S. at 88–89, 91 S.Ct. at 219–20 (spontaneity); *Nick*, 604 F.2d at 1204 (contemporaneity). The test, however, is whether the factors surrounding the making of the out-of-court statement, taken as a whole, indicate trustworthiness, not whether some mechanical list of factors indicating reliability is met. The reliability factors discussed in other cases "are not to be considered exhaustive, nor are all factors required to be present in order to admit the declarations." *Fleishman*, 684 F.2d at 1339; *see Snow*, 521 F.2d at 734–35.

Each of the factors present here, voluntariness, testimony under oath, knowledge of impending death, injurious revelations, strong corroboration, personal knowledge, limited evaluation of the declarant's demeanor by the jury, and extensive prior cross-examination by codefendants in a manner that was consistent with the interests of the defendant, constitutes an important indicium of reliability. Considered together, they provide sufficient guarantees of trustworthiness to overcome objections based on the Confrontation Clause.

The judgment of the district court dismissing Barker's habeas petition is AFFIRMED.