793 P.2d 86

**STATE of Arizona, Appellee,**

v.

**Barbara Ann SHEARER, Appellant.**

**No. 1 CA–CR 88–040.**

Court of Appeals of Arizona, Division 1, Department D.

Dec. 21, 1989.

Review Granted as to Issue A.A. only June 26, 1990.[*]

---

[*] Corcoran, J., of the Supreme Court, was not present and did not participate in the determination of this matter.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., and Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Carol A. Carrigan and James H. Kemper, Deputy Public Defenders, Phoenix, for appellant.

## OPINION

GERBER, Presiding Judge.

Appellant Barbara Ann Shearer was convicted of one count of theft and four counts of fraudulent schemes and artifices. The trial court sentenced her to concurrent aggravated terms of 10 years of imprisonment on the theft count, 21 years on one fraudulent schemes count, and 28 years on the remaining three fraudulent schemes counts. On appeal, she raises four issues:

(1) Was her constitutional right to confrontation violated?

(2) Was admission of multi-layered hearsay prejudicial error?

(3) Did the trial court improperly comment on the evidence?

(4) Were the offenses committed on the same occasion such that sentence enhancement under A.R.S. § 13–604(H) was error?

## OVERVIEW

In December 1985, appellant was indicted on one count of theft, a class 3 felony. In September 1986, appellant was indicted on four counts of fraudulent schemes and artifices, class 2 felonies. The matters were subsequently consolidated. The basis for both indictments was the allegation that

over a period of months, appellant converted and used funds which belonged to her husband and his ex-wife and then absconded.

Two trials occurred. Appellant's first trial began in May 1987. During cross-examination by defense counsel, appellant's husband, Thomas Morris "Arkie" Shearer, suffered a fatal heart attack. Of necessity, a mistrial was declared. Thereafter, the state moved for an order allowing it to use both Shearer's deposition and trial testimony in the new trial. The trial court entered an order admitting various portions of Shearer's trial and deposition testimony. A second trial which commenced in October 1987 resulted in appellant's conviction on all counts. This appeal followed.

## FACTS

Because of the bizarre and complicated origins of this case, we provide a detailed historical sketch of the parties' interactions based on testimony.

### Background

Appellant's husband, Thomas Morris "Arkie" Shearer (Shearer), began saving money when he was a boy in Arkansas. As a young man, he owned and operated several businesses there and saved a portion of his earnings. In 1957, he married Shirley Shearer. About a year later, the couple separated. Shearer moved to Phoenix, bringing with him between $200,000 and $300,000 in cash. He eventually bought property at 2401 West Van Buren where he did business as "Arkie's Used Cars." He built a home on West Monroe directly behind his business.

In the mid–1960s, Shearer stopped selling cars and went into the auto parts business as "Arkie's Auto Parts." Shirley Shearer had rejoined him, and the two worked long hours to build up the business. They continued to save money. Because of Shearer's distrust of banks, he and Shirley would wrap $20 bills in bundles, place the bundles in tool boxes, and store them in hiding places on his property.

The Shearers divorced in 1983, having secreted approximately $1,700,000 in cash.

They were the only persons who knew of its existence and location. They agreed that they would split the money upon Shearer's retirement, and if one of them died prior to that time, the survivor would keep all the money.

### Appellant's Marriage to "Arkie" Shearer

After the 1983 divorce, Shearer hired appellant as a live-in housekeeper, paying her $200 per week in cash. Shortly thereafter, Shearer and appellant became romantically involved. She also began working in the auto parts store. About a year after they met, appellant told Shearer that she wanted to marry him and that, if he did not marry her, she would move out of his house. Shearer declined the marriage offer. Appellant moved out. Approximately one month later, however, Shearer agreed to marry her and appellant moved back in with him. Prior to the marriage, the parties executed a prenuptial agreement which, however, was silent as to the Shearer fortune secreted on the property.

About seven months later, Shearer discovered that approximately $302,000 in cash was missing and possibly stolen from a doghouse where a portion of the fortune had been hidden. Shearer suspected Shirley. She denied taking the money. Shirley suggested, later, that a boyfriend of hers may have known that money was hidden in the doghouse and taken it.

Shearer contacted his three children and revealed to them, for the first time, the existence of the money and the fact that some was missing. During the course of this family discussion, appellant asked Shearer what was happening. Shearer then told her fully about the hidden fortune and the recent theft of a portion of it. Shearer told appellant that the money belonged to himself and Shirley.

Because of his concern about the remainder of the money, Shearer decided to hide it elsewhere. He and appellant removed the tool boxes containing cash from the other hiding places on the property. While removing the money, Shearer discovered that

a large portion of it had been damaged.[1] This money was put aside, and the remainder was replaced in tool boxes and placed inside two 55–gallon barrels. The next morning, appellant took the two barrels to a storage locker. When she returned, she gave Shearer a set of keys and kept a set for herself. Shearer reminded appellant that the money belonged to Shirley and himself, and that, as far as appellant was concerned, the money was "forbidden fruit."

Shearer then had appellant take the damaged money to a local bank in amounts under $10,000 to exchange it for new money. When appellant returned with the new money, Shearer placed part of it in a file cabinet in his office at Arkie's Auto Parts and part of it in a file cabinet in a poolroom at his home. Whenever Shearer had enough money to fill two tool boxes, he would give the tool boxes to appellant and instruct her to put them in the storage locker. At some point, appellant rented a second storage locker.

In March 1985, appellant purchased a new Chrysler Fifth Avenue, making three cash payments amounting to $17,000. She took title to the vehicle in her name alone and gave a Phoenix post office box as her address. Shortly thereafter, appellant bought a motor home. She also paid cash for this vehicle and again took title in her name alone, giving an address on East Camelback. She bought insurance for these vehicles and gave the insurance agent a post office box address. When told that she had to provide a residence address where the vehicles were garaged, she told the agent she was living with a friend in Scottsdale and gave a Scottsdale address which turned out to be fictitious.

Appellant did not tell Shearer of these purchases. She stored the vehicles at a house Shearer rented to Billy Compton and William Wood, employees at Arkie's U–Do–It Truck Stuff. Appellant had previously hired Compton and Wood to help her move

out of Shearer's home on Monday, April 15, a date when Shearer would be expected to be away working.

In the meantime, appellant had arranged for her daughter, Donna, to come to Phoenix on the weekend of April 13 for a "big surprise." Donna came as planned. On Sunday appellant bought a house with cash she had taken from one of the storage lockers. She told Donna that the house would be deeded in Donna's name so that it could not be traced to appellant. Appellant gave false information to the real estate agent, stating that she was divorced. After paying for the house, appellant told Donna she was leaving Shearer and that, if Shearer asked where they had been, Donna was to tell him that they had been shopping.

Meanwhile, that same Sunday, Shearer decided to check on his money in one of the storage lockers. After discovering that the money was missing, he called his daughter Carol. Carol went to Shearer's house. Together they waited for appellant to return home. When appellant and Donna returned, Shearer asked her if she intended to leave him. Appellant denied that she had any intention of leaving. Donna then left the room, and Shearer and Carol confronted appellant with the fact that the money was missing from the storage locker. Appellant admitted she had taken the money and claimed that it was her "security," stating that, as long as she had the money, "nobody is going to run me off." As appellant prepared to take Donna to the airport, Carol asked her if she was coming back. Appellant told her, "Of course. Don't be silly. I live here. Of course I'm coming back."

Appellant drove Donna to the airport but did not return. Appellant telephoned Compton and Wood and told them that Shearer knew she had taken the money. She told them that, if they wanted their personal belongings, they had better move them out of the rental house quickly.

---

1. It is unclear from the record whether Shearer discovered the damaged money at this time, or whether he had previously discovered it during a check on the condition of the money. In any event, the record is clear that appellant did not know of the existence of any money until after the theft.

*Appellant's Flight*

The next morning, appellant went to a bank to get cash from a safe deposit box. That afternoon, appellant, Compton, Wood, and another person left Phoenix, taking with them the cash, the motor home, the new Chrysler, and a U–Haul truck. At one point, appellant told Compton she had $1.4 million in cash, but she added that she was leaving some of it hidden in Phoenix.

Appellant, Compton, and Wood drove to Texas. On the way, appellant spent a great deal of money. She told Compton and Wood that Shearer would not report her to the police because he had "skimmed it off his income tax" and would go to jail. During their travels, appellant, Compton, and Wood counted out approximately $350,-000 in cash. Appellant told them that she had scattered the remainder of the money in different storage lockers so that, in case one was found, the others would be safe.

Eventually, Shearer learned that appellant was in Victoria, Texas. Shearer, Carol, and his son David flew to Victoria, where they successfully recovered the Chrysler Fifth Avenue. Appellant made a quick departure in the motor home, driving to Orlando, Florida, and eventually to Memphis, Tennessee. During her travels, appellant, using an alias, purchased a 1981 Mercedes 380 SL.

In May 1986, FBI agents arrested appellant in Tucson. Appellant told the agents that Shearer had recovered over $800,000 of the money, which she claimed was in a suitcase in the trunk of the Chrysler. She also told them that Shearer had obtained the money by skimming it from his business. She indicated to the agents that Shearer loved her and that he would drop the charges against her as soon as they got back together. Her expectation was not fulfilled.

*Trial*

The first trial ended in a mistrial caused by Shearer's death. Appellant testified at the second trial. Her defense was that she had a legal interest in the money. Specifically, she testified that Shearer told her she could use the money he placed in the file cabinet and that, if it was not enough, "you know where the other is." She admitted purchasing the motor home and the Chrysler. She denied that she ever intended to leave Shearer, and testified that she only decided to do so when Carol threatened her. She testified that, when Carol found out she had "moved" the money, Carol stated, "if you don't tell us where it is, we can do to you what we are going to do to Gonzales."[2] On the way to the airport with Donna, she decided to leave Shearer because of Carol's threat.

The jury convicted appellant on all counts. This appeal followed.

## WAS APPELLANT'S RIGHT TO CONFRONT HER ACCUSER VIOLATED?

In preparation for the first trial, appellant's counsel moved for an order compelling Shearer's deposition. This motion was made in part pursuant to Rule 15.3(a)(1), Arizona Rules of Criminal Procedure. Appellant's counsel indicated that Shearer's testimony was material, and that "Mr. Shearer has been in very poor health as of late, having spent some recent time in the hospital for a heart condition. Defendant is of the opinion that such health problems provide a substantial likelihood that he will not be available at the time of trial." The motion was granted. On August 27, 1986, counsel deposed Shearer under oath on oral interrogatories "as on cross-examination." Appellant was absent. The deposition was continued due to Shearer's weariness to October 8 and again to October 10.[3] Shear-

---

**2.** "Gonzales" was the boyfriend whom Shirley suspected of breaking into the doghouse to steal the hidden money.

**3.** At various times in her opening and reply briefs, appellant refers to the October 8 and 10 depositions as "interviews," while at other times she refers to them as "depositions." It is clear

that the trial court considered the testimony taken on these dates to be "deposition testimony." Shearer was under oath and his answers were recorded. While appellant may inconsistently refer to this testimony as "deposition" or "interview," she does not appeal from the trial court's implicit determination that the testimo-

er was cross-examined on all significant matters later introduced at trial.

Shearer next testified at the first trial. His testimony was consistent with his deposition testimony in all material respects. Shearer's fatal heart attack occurred after one and one-half hours of cross-examination.

In preparation for a retrial, the state sought a ruling on the admissibility of Shearer's previous statements both at deposition and at trial. Relying on Rule 19.3, the trial court ordered on July 31, 1987 that the state could introduce Shearer's deposition testimony. As to Shearer's trial testimony, the court issued a further order, stating:

> In order to protect the Defendant's confrontation right and to ensure that the statements sought to be admitted are supported by equivalent circumstantial guarantees of trustworthiness, the State is directed to submit to the Court by September 4, 1987 a listing of all statements sought to be introduced from Arkie Shearer's interviews and trial testimony. Among the factors to be considered by the Court in determining the trustworthiness of the statements sought to be admitted despite confrontation clause challenges are:
> 1. Opportunity to cross-examine
> 2. Presence of oath
> 3. Corroboration
> 4. Necessity and materiality.

Pursuant to this order, the state filed a written memorandum setting forth the previous trial testimony it sought to introduce and indicating other sources which would corroborate the statements proffered, including Shearer's deposition testimony. Appellant also indicated a desire to admit at retrial the entire cross-examination testimony of Shearer given on May 14, 1987. After considering the matter, the trial court entered its order on September 23, 1987 admitting the transcripts of Shearer's prior trial testimony, both on direct and on cross-examination. Specifically, the court found:

> [W]e have at least a sufficient enough record in this case for the Court at this point to be assured that there do exist sufficient indicia of reliability to allow in prior transcripts of trial testimony of Mr. Shearer without doing great harm to the confrontation rights of the defendant.

On appeal, appellant argues that the trial court erred in admitting both Shearer's trial testimony and depositions because (1) appellant, though present at trial, was not present at the time the deposition testimony was recorded, and, furthermore, (2) because she was not able to fully cross-examine her accuser at trial.

### The Right to Confrontation and Cross-Examination Generally

■ The Sixth Amendment to the United States Constitution guarantees to a defendant the right "to be confronted with the witnesses against him." Similarly, Article 2, § 24 of the Arizona Constitution guarantees to the accused the right "to meet the witnesses against him face-to-face." Sometimes, this right must give way. A literal reading of the confrontation clause would require the exclusion of any statement, however relevant, made by a declarant who was absent from trial for any reason. Such a reading has long been rejected:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). *See State v. Jeffers,* 135 Ariz. 404, 421, 661

---

ny taken on these dates was in fact "deposition testimony." In any event, this determination is irrelevant to our analysis.

P.2d 1105, 1122 (1983), *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). The confrontation clause assures an accused that the jury will have an adequate basis upon which to evaluate the truth of the statement. *See Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970). Cross-examination, although preferred, is not the sole method by which the confrontation clause may be satisfied. Absent cross-examination, the essential issue is whether, under all the circumstances, the hearsay statement has a high degree of reliability. *United States v. Nick,* 604 F.2d 1199, 1203 (9th Cir.1979); *State v. Robinson,* 153 Ariz. 191, 204, 735 P.2d 801, 814 (1987); *Jeffers, supra.*

One of the firmly rooted exceptions to the hearsay rule and, thus, to the confrontation clause is the "former testimony" exception. Rule 804(b)(1), Arizona Rules of Evidence, states:

> *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Rule 19.3(c), Arizona Rules of Criminal Procedure, provides for the admission of previously recorded testimony in a criminal case. The comment to this rule indicates:

> Rule 19.3(c) contains as broad an exception to the hearsay rule for prior recorded testimony as the confrontation clause of the sixth amendment will presently permit.... It allows the use of prior recorded testimony not merely for impeachment, but to prove the truth of the matters asserted therein, *whenever the defendant was present at the time the testimony was recorded,* was represented by counsel, had an opportunity to cross-examine with an interest and motive similar to that which he has at trial,

and the witness is either unavoidably absent, or is present at trial.

(emphasis added; citation omitted).

We thus focus a detailed inquiry on whether the trial court erroneously admitted, first, the deposition testimony and, second, the prior trial testimony.

## A. FORMER TESTIMONY EXCEPTION

### 1. *Deposition Testimony*

[2] Shearer's deposition testimony was not admissible at trial under Rule 804(b)(1) and Rule 19.3(c) because appellant was not present at the depositions. Rule 15.3(a)(1), Arizona Rules of Criminal Procedure, provides for the taking of a deposition if the deponent's testimony is material and there is a substantial likelihood that he will not be available for trial. The accused has the right to be present at any deposition taken under this circumstance. Rule 15.3(d). Although a defendant may waive this right, there is nothing in this record to indicate that appellant waived her right to be present at Shearer's depositions. In fact, at a hearing concerning the admissibility of prior testimony, appellant stated to the trial court:

> THE DEFENDANT: ... I wasn't aware of the statements that they were talking about, I'm going back to the depositions. If Mr. Shearer's depositions are allowed to be admitted into evidence, they are being accepted as the gospel truth. I feel this is unfair because I was not present when the depositions were taken.
>
> When my husband was on the witness stand, Mr. Doyle caught him in a lie. This was because of a question I had Mr. Doyle ask.

The requirement of the defendant's presence or, at least, a waiver as a precondition to the "former testimony" provision stems from the constitution's confrontational guarantee. In *State v. Alvarado,* 158 Ariz. 89, 93, 761 P.2d 163, 167 (App.1988), the court found that, where the state failed to show the defendant waived his presence at a witness' deposition, the deposition was not admissible at trial. The court relied specifically on *United States v. Benfield,*

593 F.2d 815, 821 (8th Cir.1979), which stated:

> Of course, confrontation requires cross-examination in addition to a face-to-face meeting.... The right of cross-examination reinforces the importance of *physical confrontation.* Most believe that in some undefined but real way recollection, veracity, and communication are influenced by *face-to-face* challenge. This feature is a part of the sixth amendment right additional to the right of cold, logical cross-examination by one's counsel. While a deposition necessarily eliminates a face-to-face meeting between witness and jury, we find no justification for further abridgement of the defendant's rights.
>
> . . . . .
>
> Basically the confrontation clause contemplates the active participation of the accused at all stages of the trial, including the face-to-face meeting with the witness at trial or, at the minimum, in a deposition allowing the accused to face the witness, assist his counsel, and *participate in the questioning* through his counsel.

(emphasis added; citations and footnotes omitted). This notion of "face-to-face" confrontation as a fundamental right was recently reaffirmed in *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), and *State v. Vincent,* 159 Ariz. 418, 768 P.2d 150 (1989). Therefore, although Shearer was subject to full cross-examination, his deposition testimony was inadmissible under the "former testimony" exception.

### 2. *Prior Trial Testimony*

We turn now to the question whether this "former testimony" exception authorizes use of the prior trial testimony. Appellant was present during her first trial and confronted Shearer face-to-face. However, appellant was not afforded the opportunity for full cross-examination. Although defense counsel had cross-examined Shearer for approximately one and one-half hours, he asserts that he was not more

than "one-third" finished when Shearer died.

The state argues that appellant did have a full and fair opportunity to cross-examine Shearer, and in fact extensively cross-examined him during the depositions, covering every significant matter raised at trial. The state argues further that the mere fact that this cross-examination did not occur contemporaneously with Shearer's trial testimony does not violate appellant's right to confrontation. The state attempts to support this argument by citing *Ohio v. Roberts; California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); and *Barker v. Morris,* 761 F.2d 1396 (9th Cir. 1985), *cert. denied,* 474 U.S. 1063, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

While these cases do suggest that cross-examination need not occur contemporaneously with direct testimony, the state's argument fails to address the fact that appellant was not present at the depositions where the opportunity for cross-examination occurred. We are not persuaded by the state's argument that the prior trial testimony was admissible under the "former testimony" exception of Rule 804(b)(1). As in the case of the depositions, the "former testimony" provision does not authorize use of Shearer's prior trial testimony. *Cf. State v. Schad,* 129 Ariz. 557, 569–70, 633 P.2d 366, 378–79 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (defendant not denied constitutional right to confrontation when trial court admitted suppression hearing testimony of witness under Rule 804(b)(1)).

### B. RESIDUAL EXCEPTION

That Shearer's deposition and prior trial testimony are inadmissible under the "former testimony" exception does not mean that they are inadmissible under other provisions of the Rules of Evidence. We now address whether the trial court correctly admitted Shearer's prior trial testimony under the residual exception of Rule 804(b)(5).

### 1. *Prior Trial Testimony*

The right to cross-examination is essentially a "functional" right designed to pro-

mote reliability in the truth-finding process. *Kentucky v. Stincer*, 482 U.S. 730, 737, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631, 642 (1987). The right is not violated when out-of-court statements of an unavailable witness are admitted if the statements "bear adequate indications of trustworthiness." *Id.* at 737, 107 S.Ct. at 2663, 96 L.Ed.2d at 642. Of course, if the out-of-court statement falls within a firmly rooted hearsay exception, the statement bears a high degree of reliability and the functional requirement of the confrontation clause is satisfied. *See generally Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608; *Robinson*, 153 Ariz. at 204, 735 P.2d at 814. If the statement does not fall within a specific hearsay exception, admissibility is predicated on a showing of particularized guarantees of trustworthiness and the formal requirements of Rule 804(b)(5), including the requirement of unavailability of the declarant. *Robinson, supra.* If these requirements are met, "the introduction of out-of-court statements is permissible if they are necessary and reliable. Such statements do not violate defendant's right to confrontation." *State v. Whitney*, 159 Ariz. 476, 483–84, 768 P.2d 638, 645–46 (1989). *See United States v. Marchini*, 797 F.2d 759, 765 (9th Cir.1986).

### a. Formal Requirements

■ Rule 804(b)(5) permits introduction of an out-of-court statement if (1) the declarant is unavailable; (2) the statement is evidence of a material fact; (3) the statement is more probative on the point for which it is offered than any other evidence which the proponent could produce through reasonable efforts; (4) the general purposes of the rules and the interests of justice will best be served by the admission of the statement; and (5) the proponent of the statement makes known to the adverse party sufficiently in advance of the trial his intention to offer the statement and the particulars of it.

In this case, Shearer's trial statements were obviously material. They were more probative on the points for which they were offered than any other evidence which could be produced. Even appellant agrees that Shearer's trial testimony was "crucial." Prior to trial, the state filed a notice of intention to introduce Shearer's previous statements at appellant's retrial. Numerous pleadings were filed and hearings were held to decide the issue. The trial court required the state to list specifically every statement it intended to use at trial. Appellant was then entitled to make specific written and oral objections to those statements prior to retrial. Admission of the statements would serve the interests of justice. Accordingly, the formal requirements of Rule 804(b)(5) were met. *See United States v. Mastrangelo*, 533 F.Supp. 389, 391 (E.D.N.Y.1982) (grand jury testimony of key witness murdered hours before trial admissible under Rule 804(b)(5)).

### b. Particularized Guarantees of Trustworthiness

■ The trial court specifically found that the prior testimony of Shearer had "sufficient indicia of reliability." A trial court's ruling on the admissibility of evidence under Rule 804(b)(5) will not be disturbed absent an abuse of discretion. *State v. Robles*, 135 Ariz. 92, 94, 659 P.2d 645, 647 (1983). There is no mechanical test for determining the reliability of out-of-court statements, and each case must be evaluated on its own facts. *Barker v. Morris*, 761 F.2d at 1400. The inquiry in each case must reflect "a practical concern for the accuracy of the truth-determining process." *Dutton v. Evans*, 400 U.S. at 89, 91 S.Ct. at 220, 27 L.Ed.2d at 227. We find no abuse of discretion in admitting Shearer's prior trial testimony under Rule 804(b)(5).

Shearer testified under oath, in a courtroom, and at a time when he believed he would be fully cross-examined. Shearer "accused" appellant "face-to-face" before the jury.[4] Shearer had previously been

---

4. While we realize appellant's cross-examination ended upon Shearer's death, one of the primary functions of the confrontation clause's face-to-

face guarantee was satisfied. The United States Supreme Court noted recently:

A witness 'may feel quite differently when he has to repeat his story looking at the man

exhaustively cross-examined on the same matters and was surely cognizant of his previous testimony and the ramifications of any inconsistent statements. He testified with full knowledge of his ill health. *See Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965); *Barker v. Morris*, 761 F.2d at 1401.

Finally, and perhaps most importantly, corroboration of Shearer's trial statements is abundant. Corroboration is an important "indicium of reliability" in confrontation clause analysis. *Barker v. Morris*, 761 F.2d at 1402. In evaluating equivalent circumstantial guarantees of trustworthiness, "reliability should be evaluated in light of all the circumstances." *Robinson*, 153 Ariz. at 201, 735 P.2d at 811. In examining all the circumstances, we find Shearer's prior testimony highly reliable.

Shirley Shearer testified at trial and corroborated in every instance Shearer's testimony concerning the ownership of the money and the fact that it was hidden in specific locations on the property. She also testified she never gave appellant permission to take or use any portion of her one-half interest in the money. She corroborated Shearer's statements regarding his savings habits and the method by which the two accumulated such a large quantity of cash. In fact, the only testimony Shirley Shearer was unable to directly corroborate was Shearer's statement that *he* did not give appellant permission to take or use the money.

Carol Shearer testified that she was present when appellant admitted taking the money. She testified that Shearer asked appellant if she had taken the money and she responded affirmatively. Both Carol and David Shearer testified that, after appellant failed to return from the airport that Sunday evening, they went with their father to Texas in an attempt to recover the money. They both testified to their father's efforts to recover the money and to his concern about it.

whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is.' ... It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'

Carol Shearer also testified that she was present when appellant admitted the money belonged to Shearer, and that appellant had taken it without his permission.

Q. After [Donna] goes to the house, what next transpires?

A. My dad [Shearer] then asked Barbara [appellant], if she had told me where she had moved the money to. And Barbara said, no, that she hadn't.

Q. "If she had told me." "Have you told Carol," is that what you're saying?

A. Right. Uh-huh.

Q. Okay.

A. And she said, "No." And so, my dad said, "Well, I went there this morning and the money is gone. Do you know anything about it?" And she said, "Yes."

And he said, "Well, did you take it?" And she said, "Yes."

And he said, "Why did you take it?" Actually, by that time, I said to her, "Why did you take it?" And she said, "That's my security. He was getting ready to kick me out of here and I want to stay here and I don't want to leave. And, as long as I have the money, then I get to stay here."

And, at this point I said, "Well, whose money is it? Is it your money or his money?" And she said, "It's his money."

And I said, "Well who has possession of it now?" And she said, "Well, I do."

And I said, "Well, do you know how to distinguish the difference between your property and his property?" And she said, "Yeah."

And I said, "Is it his property?" And she said, "Yeah."

I said, "If it's his property and it's in your possession, that sounds like stealing to me." And she said, "No. That's my security. As long as I have that, I'm safe here."

*Coy v. Iowa*, 487 U.S. at 1019, 108 S.Ct. at 2802, 101 L.Ed.2d at 866 (citation omitted).

The most damning corroboration of Shearer's trial statements, however, can be found in appellant's own words and actions. According to trial testimony, on Sunday, April 14, she admitted to Shearer that she had taken the money. She then promised she would return after taking her daughter to the airport, but did not. As Wood and Compton testified, appellant had planned to move out of Shearer's house on Monday when Shearer would be away at work. When Shearer discovered the money was missing, appellant contacted Wood and Compton and told them they had to move out that night (Sunday). Other evidence in the record established that, after taking the money, appellant surreptitiously left Arizona without contacting Shearer. There was also testimony that appellant provided false information when she purchased a home and vehicles. Her actions could be described, at best, as inconsistent with the rightful possession of the money.

Further, a letter written by appellant to Shearer was also inconsistent with her defense at trial. This letter stated, in part:

Do not call Carol, David or Tommy. [I]f I see them anywhere near me or anyone else I will notify the 'I.R.S.' I have a letter from the bank saying you deposited multilated money in an account. There is also some of that money hidden around the place. Only I know where it is.... If anything happens to me or I am harmed in any way a copy will be sent to the I.R.S. with the appropriate keys telling them where to look.

I'm sorry to do things this way but when you accused me of running around and asked for a divorce I could see the handwriting on the wall.[5]

In sum, the corroborating evidence substantially bolsters the reliability of Shearer's prior testimony. *See, e.g., Marchini,* 797 F.2d at 765; *United States v. West,* 574 F.2d 1131, 1136–38 (4th Cir.1978) (admission at trial of deceased witness' grand jury testimony not barred by confrontation clause). Cross-examination at trial is

usually the best but not the only way to assure the trustworthiness of evidence introduced at a trial. Here, Shearer was clearly unavailable as a witness. Because his previous trial testimony had great probative value and a high degree of trustworthiness, the reception of the statements in the trial outweighed any risk to appellant that unreliable evidence would be received against her, the deficiencies of which could not be adequately tested by cross-examination. *Marchini, supra* (admission of grand jury testimony of unavailable witness under Rule 804(b)(5) does not violate confrontation clause where there is adequate indicia of reliability characterized by particularized guarantees of trustworthiness). We conclude that admission at appellant's second trial of Shearer's sworn testimony from the first trial did not violate the confrontation clause of either the United States or Arizona Constitutions.

### 2. *Deposition Testimony*

■ We turn now to the admissibility of Shearer's depositions. In *Coy v. Iowa,* the supreme court held that violations of the confrontation clause are subject to the harmless error analysis, explaining:

An assessment of harmlessness cannot include consideration of whether the witness's testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and *harmlessness must therefore be determined on the basis of the remaining evidence.*

487 U.S. at 1019, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (emphasis added). *See also State v. Wilhite,* 160 Ariz. 228, 233, 772 P.2d 582, 587 (App.1989).

Although Shearer's deposition testimony was not admissible under the "former testimony" exception and under Rule 19.3, we find that the statements therein were cumulative and consistent with the state-

5. If, as appellant alleged, Shearer "skimmed" the money from his business and hence illegally paid no tax, his statements would be admissible under Rule 804(b)(3) as against his interest because they would subject him to criminal and civil liability.

ments admitted at trial,[6] and therefore were either admissible under the catch-all exception[7] or were harmless error.

## WAS ADMISSION OF MULTI–LAYERED HEARSAY PREJUDICIAL ERROR?

Appellant argues that many statements admitted into evidence by way of Shearer's depositions were hearsay violating her right to confrontation. We note that appellant failed to object either prior to trial or at trial on the grounds of hearsay. The trial court informed counsel that its ruling regarding the admissibility of the depositions was subject to any objections counsel wished to raise. We agree with the state that appellant could have objected to the entire deposition testimony or any portion thereof on any ground, including hearsay. Appellant did not do so. Having failed to do so on hearsay grounds appellant has waived any error. Failure to raise a specific hearsay objection in the trial court precludes a claim of error on appeal absent fundamental error. *State v. Allen*, 157 Ariz. 165, 170, 755 P.2d 1153, 1158 (1988). Here, any introduction of inadmissible deposition testimony was clearly harmless. The remaining evidence of appellant's guilt was overwhelming. *Coy v. Iowa*, 487 U.S. at 1019, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. In any event, although the deposition testimony was more comprehensive than the trial testimony, it was in all significant respects consistent with the trial testimony and almost entirely cumulative.

## DID THE TRIAL COURT IMPROPERLY COMMENT ON THE EVIDENCE?

Appellant argues the trial court improperly commented on the evidence. During voir dire, the trial judge stated with reference to Shearer's prior testimony:

I mention this to you because as trial jurors in a courtroom where prior evidence or transcripts are being read, not only will you be obliged to pay very close attention, not nod off, keep reasonable and as thorough notes as possible, but treat that transcript as evidence in the same manner that you would treat or consider the testimony of a live witness.

The following day, the court stated:

Your ultimate job will be to apply the law in the legal instructions to the facts of the case as you have found them and decide the case accordingly.

Now, when I talk about finding the facts from the evidence, the evidence that you are to consider consists of testimony of witnesses and any physical items or exhibits that are admitted during the course of the trial.

As stated during voir dire, we also anticipate that quite a bit of evidence will also be presented by way of reading transcripts, and that also is evidence that you are to consider.

. . . . .

Mrs. Reifman, our court reporter, is taking down everything that is stated in the courtroom. But, to transform her unique notes into a transcript to assist a jury during their deliberations, would take at least twice as long as the actual trial, so you will not have access to a transcript of the proceedings.

When any transcripts are read of prior statements during the course of the trial, those also would not be provided to you to review, so your notes could make a very, very big difference in resolving factual issues that could arise. You can never tell what can turn into a factual issue, so I urge you to take advantage of that notebook.

---

**6.** That the statements were consistent with each utterance lends trustworthiness to them. *See State v. LaGrand*, 153 Ariz. 21, 28, 734 P.2d 563, 570 (1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987) ("[s]tatements which are repeated and are consistent are more trustworthy than statements which are repeated but inconsistent.") *See also Mastrangelo, supra*

(statements were affirmed several times and witness never recanted).

**7.** Because the statements were admissible under the catch-all provision, it is irrelevant that they were admitted pursuant to Rule 19.3 and the "former testimony" exception. We may affirm on any basis supported by the record. *Robinson*, 153 Ariz. at 199, 735 P.2d at 809.

■ Appellant claims these comments conveyed to the jury a personal opinion as to the truth or falsity of the evidence and as such were reversible error. We disagree. In order to comment on the evidence a trial court must express an *opinion* as to what the evidence proves. *State v. Barnes,* 124 Ariz. 586, 590, 606 P.2d 802, 806 (1980). In this case, the trial court did nothing more than explain to the jury the types of evidence it would hear and the importance of paying attention and taking careful notes. There is not the remotest insinuation as to what the evidence establishes.

WAS SENTENCE ENHANCEMENT UNDER A.R.S. § 13–604(H) ERROR?

■ Finally, appellant argues that the use of Count I, theft, as in *Hannah,*[8] prior to enhance the sentences on the remaining counts violated A.R.S. § 13–604(H), which provides:

> Convictions for two or more offenses not committed on the same occasion but consolidated for trial purposes may, at the discretion of the state, be counted as prior convictions for purposes of this section. Convictions for two or more offenses committed on the same occasion shall be counted as only one conviction for purposes of this section.

Appellant's sentences on the fraudulent schemes and artifices counts (II–V) were enhanced by her conviction on the theft count (I).[9] Appellant argues that the theft count involved the conversion of $1.4 million, while the fraudulent schemes and artifices counts involved individual expenditures of that money. Thus, appellant argues, the theft count was "committed on the same occasion" as the fraudulent schemes counts.

An analysis of whether different crimes fall within the "same occasion" limitation of A.R.S. § 13–604(H) must include reference to the time, place, number of victims, and distinct nature of defendant's acts. *State v. Henry,* 152 Ariz. 608, 612, 734 P.2d 93, 97 (1987). Applying these factors in this case, we find that the theft count was not committed on the "same occasion" as the fraudulent schemes counts.

The evidence introduced at trial showed that appellant took $1.4 million in cash from the storage lockers. Although there was no direct evidence pinpointing the exact date when appellant formed the intent to deprive Shearer of the money, the state alleged that this intent was formed sometime between November 1, 1984, and April 15, 1985. Whatever the allegations, the elements for commission of the crime of theft were satisfied whenever appellant in fact removed the money from the lockers with the intent to steal it. The evidence supports the conclusion that the decision to steal the cash fell between these dates.

Conversely, the evidence showed that appellant committed fraudulent schemes (1) to obtain an automobile on or about March 31, 1985 from "Arkie" and Shirley Shearer and Bill Luke Chrysler (count II); (2) to obtain a motor home on or about April 3, 1985 from the Shearers and Dayle E. Bell (count III); (3) to obtain insurance on or about April 4, 1985 from the Shearers and Kenneth A. Bock Insurance Services (count IV); and (4) to obtain a house on or about April 13, 1985 from the Shearers and Morris and Bonnie Nicholson (count V). The trial evidence bears out these exact dates. With the exception of "Arkie" Shearer, the fraudulent schemes counts were committed against different victims. Further, the theft count and the fraudulent schemes counts were not part of a continuous series of criminal acts, but were separate criminal acts, distinct in nature from appellant's theft of the $1.4 million from Shearer. *See State v. Vild,* 155 Ariz. 374, 746 P.2d 1304 (App.1987) (conspiracy to sell cocaine did

---

8. *State v. Hannah,* 126 Ariz. 575, 617 P.2d 527 (1980) (a prior felony conviction may be used for enhancement purposes if the prior conviction is obtained after the commission of the principal offense).

9. Appellant's sentences on counts III–V were also further enhanced by her conviction on count II, fraudulent schemes and artifices. She does not argue on appeal that enhancement of these sentences on this basis was error.

not occur on the "same occasion" as the substantive crime of possession).

For all of the foregoing reasons, the convictions and sentences are affirmed.

FIDEL, J., and ROBERTO C. MONTIEL, J. Pro Tem., concur.

NOTE: The Honorable ROBERTO C. MONTIEL of the Santa Cruz County Superior Court, State of Arizona, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. VI, § 3.